Ronald **BRADLEY** et al., Plaintiffs,

v.

William G. **MILLIKEN** et al., Defendants,

and

Detroit Federation of Teachers, Local 231,
American Federation of Teachers,
AFL–CIO, Defendant-Intervenor,

and

Denise Magdowski et al., Defendants-
Intervenor.

Civ. A. No. 35257.

United States District Court,
E. D. Michigan, S. D.

June 14, 1972.

Louis R. Lucas, William E. Caldwell, Ratner, Sugarmon & Lucas, Memphis, Tenn., J. Harold Flannery, Paul R. Dimond, Robert Pressman, Center for Law and Education, Cambridge, Mass., Jack Greenberg, Norman J. Chachkin, New York City, E. Winther McCroom, Cincinnati, Ohio, Nathaniel R. Jones, General Counsel, N. A. A. C. P., New York City, for plaintiffs.

Frank J. Kelley, Atty. Gen., State of Mich., by Eugene Krasicky, Gerald Young, Asst. Attys. Gen., Lansing, Mich., for State defendants.

George T. Roumell, Jr., Louis D. Beer, Riley & Roumell, Detroit, Mich., for Detroit Board of Education.

Theodore Sachs, Ronald R. Helveston, Rothe, Marston, Mazey, Sachs, O'Connell, Nunn & Fried, Detroit, Mich., for intervenor Detroit Federation of Teachers.

Alexander B. Ritchie, Fenton, Nederlander, Dodge & Barris, P. C., Detroit, Mich., for intervenor Denise Magdowski, and others.

Robert J. Lord, Fair Haven, Mich., for intervenor Green, and others; Tri-County Citizens for Intervention.

Douglas H. West, Robert B. Webster, Hill, Lewis, Adams, Goodrich & Tait, Detroit, Mich., for intervenor Grosse Pointe Schools.

William M. Saxton, Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., for intervenor Allen Park Public Schools, and others.

Richard P. Condit, Condit & McGarry, P. C., Bloomfield Hills, Mich., for intervenor Southfield Public Schools.

Kenneth B. McConnell, Hartman, Beier, Howlett, McConnell & Googasian, Bloomfield Hills, Mich., for intervenor Royal Oak School District.

Ralph B. Guy, Jr., U. S. Atty., E. D. of Michigan, Detroit, Mich., for the United States, amicus curiae.

## RULING ON DESEGREGATION AREA AND ORDER FOR DEVELOPMENT OF PLAN OF DESEGREGATION

ROTH, District Judge.

On September 27, 1971, 338 F.Supp. 582, the court made its Ruling on Issue of Segregation, holding that illegal segregation exists in the public schools of the City of Detroit as a result of a course of conduct on the part of the State of Michigan and the Detroit Board of Education. Having found a constitutional violation as established, on October 4, 1971 the court directed the school board defendants, City and State, to develop and submit plans of desegregation, designed to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. The directive called for the submission of both a "Detroit-only" and a "Metropolitan" plan.

Plans for the desegregation of the Detroit schools were submitted by the Detroit Board of Education and by the plaintiffs. Following five days of hearings the court found that while plaintiffs' plan would accomplish more desegregation than now obtains in the system, or which would be achieved under either Plan A or C of the Detroit Board of Education submissions, none of the plans would result in the desegregation of the public schools of the Detroit school district. The court, in its findings of fact and conclusions of law, concluded that

"relief of segregation in the Detroit public schools cannot be accomplished within the corporate geographical limits of the city," and that it had the authority and the duty to look beyond such limits for a solution to the illegal segregation in the Detroit public schools. Accordingly, the court ruled, it had to consider a metropolitan remedy for segregation.

The parties submitted a number of plans for metropolitan desegregation. The State Board of Education submitted six—without recommendation, and without indicating any preference. With the exception of one of these, none could be considered as designed to accomplish desegregation. On the other hand the proposals of intervening defendant Magdowski, et al., the Detroit Board of Education and the plaintiffs were all good faith efforts to accomplish desegregation in the Detroit metropolitan area. The three plans submitted by these parties have many similarities, and all of them propose to incorporate, geographically, most—and in one instance, all—of the three-county area of Wayne, Oakland and Macomb.

The hearing on the proposals have set the framework, and have articulated the criteria and considerations, for developing and evaluating an effective plan of metropolitan desegregation. None of the submissions represent a complete plan for the effective and equitable desegregation of the metropolitan area, capable of implementation in its present form. The court will therefore draw upon the resources of the parties to devise, pursuant to its direction, a constitutional plan of desegregation of the Detroit public schools.

Based on the entire record herein, the previous oral and written rulings and orders of this court, and the Findings of Fact and Conclusions of Law filed herewith, it is ordered:

I.

A. As a panel charged with the responsibility of preparing and submitting an effective desegregation plan in

accordance with the provisions of this order, the court appoints the following: *

1. A designee of the State Superintendent of Public Instruction; **

2. Harold Wagner, Supervisor of the Transportation Unit in the Safety and Traffic Education Program of the State Department of Education;

3. Merle Henrickson, Detroit Board of Education;

4. Aubrey McCutcheon, Detroit Board of Education;

5. Freeman Flynn, Detroit Board of Education;

6. Gordon Foster, expert for plaintiffs;

7. Richard Morshead, representing defendant Magdowski, et al.;

8. A designee of the newly intervening defendants; **

9. Rita Scott, of the Michigan Civil Rights Commission.

Should any designated member of this panel be unable to serve, the other members of the panel shall elect any necessary replacements, upon notice to the court and the parties. In the absence of objections within five days of the notice, and pending a final ruling, such designated replacement shall act as a member of the panel.

B. As soon as possible, but in no event later than 45 days after the issuance of this order, the panel is to develop a plan for the assignment of pupils as set forth below in order to provide the maximum actual desegregation, and shall develop as well a plan for the transportation of pupils, for implementation for all grades, schools and clusters in the desegregation area. Insofar as required by the circumstances, which are to be detailed in particular, the panel may recommend immediate implementation of an interim desegregation plan for grades K–6, K–8 or K–9 in all or in as many clusters as practicable, with complete and final desegregation to proceed in no event later than the fall 1973 term. In its transportation plan the panel shall, to meet the needs of the proposed pupil assignment plan, make recommendations, including the shortest possible timetable, for acquiring sufficient additional transportation facilities for any interim or final plan of desegregation. Such recommendations shall be filed forthwith and in no event later than 45 days after the entry of this order. Should it develop that some additional transportation equipment is needed for an interim plan, the panel shall make recommendations for such acquisition within 20 days of this order.

C. The parties, their agents, employees, successors, and all others having actual notice of this order shall cooperate fully with the panel in their assigned mission, including, but not limited to, the provision of data and reasonable full and part-time staff assistance as requested by the panel. The State defendants shall provide support, accreditation, funds, and otherwise take all actions necessary to insure that local officials and employees cooperate fully with

---

* By a subsequent order of the court, entered June 29, 1972, two additional panel members were named: Mary Ellen Riordan, President, Detroit Federation of Teachers; and a designee of the Michigan Education Association (MEA), who was later identified as Melvin Leasure.

** The designees of the State Superintendent of Public Instruction and newly intervening defendants shall be communicated to the court within seven days of the entry of this order. In the event the newly intervening defendants cannot agree upon a designee, they may each submit a nominee within seven days from the entry of this order, and the court shall select one of the nominees as representative of said defendants.

The designee of the State Superintendent of Public Instruction was later identified as Dr. William Pierce, Deputy Superintendent of Public Instruction, and the designee later agreed upon by the newly intervening defendants was Dr. William Emerson, Superintendent of Oakland Schools.

the panel. All reasonable costs incurred by the panel shall be borne by the State defendants; provided, however, that staff assistance or other services provided by any school district, its employees or agents, shall be without charge, and the cost thereof shall be borne by such school district.

## II.

A. Pupil reassignment to accomplish desegregation of the Detroit public schools is required within the geographical area which may be described as encompassing the following school districts (see Exhibit P.M. 12), and hereinafter referred to as the "desegregation area":

| | | |
|---|---|---|
| Lakeshore | Birmingham | Fairlane |
| Lakeview | Hazel Park | Garden City |
| Roseville | Highland Park | North Dearborn Heights |
| South Lake | Royal Oak | Cherry Hill |
| East Detroit | Berkley | Inkster |
| Grosse Pointe | Ferndale | Wayne |
| Centerline | Southfield | Westwood |
| Fitzgerald | Bloomfield Hills | Ecorse |
| Van Dyke | Oak Park | Romulus |
| Fraser | Redford Union | Taylor |
| Harper Woods | West Bloomfield | River Rouge |
| Warren | Clarenceville | Riverview |
| Warren Woods | Farmington | Wyandotte |
| Clawson | Livonia | Allen Park |
| Hamtramck | South Redford | Lincoln Park |
| Lamphere | Crestwood | Melvindale |
| Madison Heights | Dearborn | Southgate |
| Troy | Dearborn Heights | Detroit |

Provided, however, that if in the actual assignment of pupils it appears necessary and feasible to achieve effective and complete racial desegregation to reassign pupils of another district or other districts, the desegregation panel may, upon notice to the parties, apply to the court for an appropriate modification of this order.

B. Within the limitations of reasonable travel time and distance factors, pupil reassignments shall be effected within the clusters described in Exhibit P. M. 12 so as to achieve the greatest degree of actual desegregation to the end that, upon implementation, no school, grade or classroom be substantially disproportionate to the overall pupil racial composition. The panel may, upon notice to the parties, recommend reorganization of clusters within the desegregation area in order to minimize administrative inconvenience, or time and/or numbers of pupils requiring transportation.

C. Appropriate and safe transportation arrangements shall be made available without cost to all pupils assigned to schools deemed by the panel to be other than "walk-in" schools.

D. Consistent with the requirements of maximum actual desegregation, every effort should be made to minimize the numbers of pupils to be reassigned and requiring transportation, the time pupils spend in transit, and the number and cost of new transportation facilities to be acquired by utilizing such techniques as clustering, the "skip" technique, island zoning, reasonable staggering of school hours, and maximization of use of existing transportation facilities, including buses owned or leased by school districts and buses operated by public transit authorities and private charter companies. The panel shall develop ap-

propriate recommendations for limiting transfers which affect the desegregation of particular schools.

E. Transportation and pupil assignment shall, to the extent consistent with maximum feasible desegregation, be a two-way process with both black and white pupils sharing the responsibility for transportation requirements at all grade levels. In the determination of the utilization of existing, and the construction of new, facilities, care shall be taken to randomize the location of particular grade levels.

F. Faculty and staff shall be reassigned, in keeping with pupil desegregation, so as to prevent the creation or continuation of the identification of schools by reference to past racial composition, or the continuation of substantially disproportionate racial composition of the faculty and staffs, of the schools in the desegregation area. The faculty and staffs assigned to the schools within the desegregation area shall be substantially desegregated, bearing in mind, however, that the desideratum is the balance of faculty and staff by qualifications for subject and grade level, and then by race, experience and sex. In the context of the evidence in this case, it is appropriate to require assignment of no less than 10% black faculty and staff at each school, and where there is more than one building administrator, every effort should be made to assign a bi-racial administrative team.

G. In the hiring, assignment, promotion, demotion, and dismissal of faculty and staff, racially non-discriminatory criteria must be developed and used; provided, however, there shall be no reduction in efforts to increase minority group representation among faculty and staff in the desegregation area. Affirmative action shall be taken to increase minority employment in all levels of teaching and administration.

H. The restructuring of school facility utilization necessitated by pupil reassignments should produce schools of substantially like quality, facilities, extracurricular activities and staffs; and the utilization of existing school capacity through the desegregation area shall be made on the basis of uniform criteria.

I. The State Board of Education and the State Superintendent of Education shall with respect to all school construction and expansion, "consider the factor of racial balance along with other educational considerations in making decisions about new school sites, expansion of present facilities * * * "; and shall, within the desegregation area disapprove all proposals for new construction or expansion of existing facilities when "housing patterns in an area would result in a school largely segregated on racial * * * lines," all in accordance with the 1966 directive issued by the State Board of Education of local school boards and the State Board's "School Plant Planning Handbook" (see Ruling on Issue of Segregation, p. 13.).

J. Pending further orders of the court, existing school district and regional boundaries and school governance arrangements will be maintained and continued, except to the extent necessary to effect pupil and faculty desegregation as set forth herein; provided, however, that existing administrative, financial, contractual, property and governance arrangements shall be examined, and recommendations for their temporary and permanent retention or modification shall be made, in light of the need to operate an effectively desegregated system of schools.

K. At each school within the desegregated area provision shall be made to insure that the curriculum, activities, and conduct standards respect the diversity of students from differing ethnic backgrounds and the dignity and safety of each individual, students, faculty, staff and parents.

L. The defendants shall, to insure the effective desegregation of the schools in the desegregation area, take immediate action including, but not limited to, the establishment or expansion of in-service training of faculty and staff, create bi-racial committees, employ black counselors, and require bi-ra-

cial and non-discriminatory extra-curricular activities.

### III.

The State Superintendent of Public Instruction, with the assistance of the other state defendants, shall examine, and make recommendations, consistent with the principles established above, for appropriate interim and final arrangements for the (1) financial, (2) administrative and school governance, and (3) contractual arrangements for the operation of the schools within the desegregation area, including steps for unifying, or otherwise making uniform the personnel policies, procedures, contracts, and property arrangements of the various school districts.

Within 15 days of the entry of this order, the Superintendent shall advise the court and the parties of his progress in preparing such recommendations by filing a written report with the court and serving it on the parties. In not later than 45 days after the entry of this order, the Superintendent shall file with the court his recommendations for appropriate interim and final relief in these respects.

In his examination and recommendations, the Superintendent, consistent with the rulings and orders of this court, may be guided, but not limited, by existing state law; where state law provides a convenient and adequate framework for interim or ultimate relief, it should be followed, where state law either is silent or conflicts with what is necessary to achieve the objectives of this order, the Superintendent shall independently recommend what he deems necessary. In particular, the Superintendent shall examine and choose one appropriate interim arrangement to oversee the immediate implementation of a plan of desegregation.

### IV.

Each party may file appropriate plans or proposals for inclusion in any final order which may issue in this cause. The intent of this order is to permit all the parties to proceed apace with the task before us: fashioning an effective plan for the desegregation of the Detroit public schools.

Fifteen days after the filing of the reports required herein, hearings will begin on any proposal to modify any interim plan prepared by the panel and all other matters which may be incident to the adoption and implementation of any interim plan of desegregation submitted. The parties are placed on notice that they are to be prepared at that time to present their objections, alternatives and modifications. At such hearing the court will not consider objections to desegregation or proposals offered "instead" of desegregation.

Hearings on a final plan of desegregation will be set as circumstances require.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF RULING ON DESEGREGATION AREA AND DEVELOPMENT OF PLAN

On the basis of the entire record in this action, including particularly the evidence heard by the court from March 28 through April 14, 1972, the court now makes the following Supplementary Findings of Fact and Conclusions of Law. It should be noted that the court has taken no proofs with respect to the establishment of the boundaries of the 86 public school districts in the counties of Wayne, Oakland and Macomb, nor on the issue of whether, with the exclusion of the city of Detroit school district, such school districts have committed acts of de jure segregation.

### INTRODUCTION

1. On September 27, 1971, this court issued its Ruling on Issue of Segregation. On October 4, 1971, this court issued from the bench guidelines to bind the parties in the submission of plans to remedy the constitutional violation found, *i. e.,* school segregation; and in particular this court noted that the primary objective before us was to develop and implement a plan which attempts to

"achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." The same day this court reiterated these requirements by orders "that the Detroit Board of Education submit a plan for the desegregation of its schools within 60 days" and "that the State defendants submit a metropolitan plan of desegregation within 120 days." In response to these orders hearings were held, and thereafter rulings issued, on Detroit-only plans (see Findings of Fact and Conclusions of Law on Detroit-Only Plans of Desegregation) and on the propriety of considering remedies which extend beyond the corporate geographic limits of the city of Detroit. (See Ruling on Propriety of Considering a Metropolitan Remedy to Accomplish Desegregation of the Public Schools of the City of Detroit.) Between March 28, 1972 and April 14, 1972, hearings were held on metropolitan proposals for desegregation of the Detroit public schools.

2. From the initial ruling on September 27, 1971, to this day, the basis of the proceedings has been and remains the violation: de jure school segregation. Since Brown v. Board of Education the Supreme Court has consistently held that the remedy for such illegal segregation is desegregation. The racial history of this country is writ large by constitutional adjudication from Dred Scott v. Sanford to Plessy v. Ferguson to *Brown.* The message in *Brown* was simple: the Fourteenth Amendment was to be applied full force in public schooling. The Court held that "state-imposed" school segregation immeasurably taints the education received by all children in the public schools; perpetuates racial discrimination and a history of public action attaching a badge of inferiority to the black race in a public forum which importantly shapes the minds and hearts of succeeding generations of our young people; and amounts to an invidious racial classification. Since *Brown* the Supreme Court has consistently, and with increasing force, held that the remedy upon finding de jure segregation is prompt and maximum actual desegregation of the public schools by all reasonable, feasible, and practicable means available. This court finds that there is nothing in the law, wisdom, or facts, and the particular circumstances and arguments, presented in this case, which suggests anything except the affirmance of these principles in both fact and law.

3. The task before this court, therefore, is now, and, since September 27, 1971, has always been, how to desegregate the Detroit public schools. The issue, despite efforts of the intervenors to suggest a new rationale for a return to the discredited "separate but equal" policy,[1] is not whether to desegregate.

---

1. In the main such proof entirely misses the point: the violation here found has to do with school segregation caused in substantial part by force of public authority and action; yet the intervening defendants' questions and offer of proof speak mainly to educational theory and recent and sometimes contradictory research about narrowly measured educational effects, mostly on achievement test scores, of quite limited beginnings of racial, or socio-economic integration of various types and as compared with the effects of dollar or other resource inputs and continued segregation. This court does not understand, however, that such research, from the Coleman report to its many reanalyses, formed the primary bases for the Brown decision or any of its progeny. See, e. g., Brunson v. Bd. of Trustees, 429 F.2d 820, 826 (4th Cir. 1970) (J. Sobeloff, concurring). In a context similar to newly intervening defendants' objections to desegregation, the Supreme Court in Swann specifically held that such factors constitute an impermissible limit upon the duty to desegregate. 402 U.S. at 24, Fn. 8. Citation to such research, either in support or rejection of school desegregation, misses the primary point: insofar as pupil assignments are concerned, the system of public schooling in every state must be operated in a racially non-discriminatory, unified fashion; until that objective is met, the very system of public schooling constitutes an invidious racial classification. The adoption of an education theory having the effect of maintaining a pattern of de jure segregation is therefore clearly

That question has been foreclosed by the prior and settled commands of the Supreme Court and the Sixth Circuit. Our duty now is to "grapple with the flinty, intractable realities"[2] of implementing the constitutional commands.

4. In the most recent set of hearings, several issues were addressed generally, including appropriate methods of pupil reassignment to desegregate schools; quality and capacity of school facilities; transportation needs incident to school desegregation; the effects of new school construction, and judicially established controls thereon, on any plan of desegregation; the reassignment of faculty and restructuring of facilities incident to pupil reassignment to accomplish school desegregation; appropriate and necessary interim and final administrative and financial arrangements; appropriate community, parental, staff, and pupil involvement in the desegregation process; and attention to individual, cultural, and ethnic values, respect, dignity and identity. But the primary question addressed by these hearings, in the absence of submission of a complete desegregation plan by the state, remains the determination of the area necessary and practicable effectively to eliminate "root and branch" the effects of state-imposed and supported segregation and to desegregate the Detroit public schools.

## SUPPLEMENTARY FINDINGS OF FACT

### A. The Desegregation Area

5. The State Board of Education filed six (6) "plans" without recommendation or preference; intervening defendants Magdowski, et al., filed a proposal for metropolitan desegregation which included most of the tri-county area; the defendant Detroit Board of Education filed a proposal for metropolitan desegregation which included the entire tri-county area.[3] At the hearing plaintiffs presented a modification of the three proposals which actually described areas within which pupil desegregation was to be accomplished.

6. In the consideration of metropolitan plans of desegregation of the Detroit public schools, the State defendants stand as the primary defendants. They bear the initial burden of coming forward with a proposal that promises to work. In the context of this case, they represent the "school authorities"[4] to whom equity courts traditionally have

---

impermissible. (Whether such theories, research, or evidence on educational quality or inequality form the basis for requiring judicial intervention and relief in the absence of a finding of de jure segregation is a question this court need not face.)

In any event, the Court of Appeals for the Sixth Circuit held, on June 19, 1970, that greater, not less, desegregation is the proper manner to alleviate the problem of disparity in achievement. Monroe v. Board of Commissioners, Jackson, Tenn., 427 F.2d 1005, 1008 (6th Cir. 1970).

2. Chief Justice Burger in Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 6, 91 S.Ct. 1267, 28 L.Ed.2d 554.

3. Defendant(s) Magdowski, et al., originally opposed to desegregation, during the course of the taking of proofs on the issue of segregation, conceded that the public schools of the city of Detroit were in fact segregated, and took the early lead in suggesting that the only effective avenue for desegregation was a metropolitan plan. The Detroit Board of Education, while continuing to deny that it has been guilty of any act of segregation, took the position that if desegregation were to be undertaken it could be done only on a metropolitan basis. So that now the white parents of the city of Detroit and its Board of Education—the parties most directly involved with the lot of the students in the Detroit school system—see no alternative to, and, for all practical purposes seek a metropolitan solution to the basic Detroit school problem.

4. In the context of this hearing, the defendant Detroit Board of Education is not in a position to act as the usual "school authority" primarily responsible for suggesting an appropriate desegregation area simply because its authority does not extend beyond the geographic limits of the city of Detroit. The competence, knowledge of local conditions, and expertise of those schoolmen who helped prepare the Detroit Board's proposal, however, may be utilized and given appropriate weight.

shown deference in these matters.[5] Yet in its submission without recommendation of six (6) "plans" the State Board of Education has failed to meet, or even attempt to meet, that burden and none of the other State defendants has filled the void.

7. The State Board refused to make any recommendation to the court about the appropriate area for desegregation. In State Defendant Porter's words, the State Board "didn't make a decision, period." Defendants Milliken and Kelley merely filed objections to all six (6) plans.

8. Three of the State "plans" merely proposed concepts alternative to maximum actual desegregation. The Racial Proportion Plan described a statistical method of determining the number of transfers involved in achieving a particular racial ratio in each school once an area of desegregation had been chosen. The Equal Educational Opportunity and Quality Integration Plan was admitted to be a non-plan and described criteria for education which, in whole or part, might, or might not, be applicable to any school system.

9. Only one State "plan," the Metropolitan District Reorganization Plan, attempted to describe an area within which desegregation should occur, called the "initial operating zone" (sometimes referred to hereafter as the "State Proposal"). That "plan," however, was primarily concerned with discussing a new governance structure for the desegregation area. Pupil reassignment was mentioned only in passing and no foundation was laid by State defendants for the particular area of desegregation described. Further, it suffered from the default of the State defendants by their stubborn insistence that under their self-serving, and therefore self-limiting, view of their powers they were free to

ignore the clear order of this court and abdicate their responsibility vested in them by both the Michigan and Federal Constitution for supervision of public education and equal protection for all citizens.

10. From the very limited evidence in the record in support of the area in that state proposal, the primary foundation appears to be the particular racial ratio attained in that plan, approximately 65% black, 35% white, with the provision that the area could be expanded if "white flight" ensued. In the absence of any other persuasive foundation, such area is not based on any definable or legally sustainable criteria for either inclusion or exclusion of particular areas; and the concept of an "initial operating zone" raises serious practical questions, which should be avoided if a more permanent solution is now possible. In short, the area described by the "initial operating zone" does not appear to be based primarily on relevant factors, like eliminating racially identifiable schools; accomplishing maximum actual desegregation of the Detroit public schools; or avoiding, where possible, maintaining a pattern of schools substantially disproportionate to the relevant school community's racial composition by force of deliberate action by public authority. Nor, on the evidence in this record, is the "initial operating zone" based on any practical limitation of reasonable times and distances for transportation of pupils. These factors seem to have played little part in the creation of the "initial operating zone" and are reflected less in its result.

11. At the hearings, moreover, the State defendants did not purport to present evidence in support, or even in opposition, to the State Proposal. The State, despite prodding by the court, presented only one witness, who merely

---

5. In Oliver v. Kalamazoo Board of Education, #K88–71, Judge Fox pointed out the primary responsibility of the state: "The State of Michigan is represented by two entities, but the entity is an agent of the State . . . . [T]he Constitu-tion says something about your [the State's] responsibility." The court went on to order the State to take an active role. Pre-trial order and transcript, May 1, 1972.

explained what appeared on the face of the various State "Plans" submitted. The State's cross examination of witnesses was of no assistance to the court in ascertaining any preference, legal or educational. Put bluntly, State defendants in this hearing deliberately chose not to assist the court in choosing an appropriate area for effective desegregation of the Detroit public schools. Their resistance and abdication of responsibility throughout has been consistent with the other failures to meet their obligations noted in the court's earlier rulings. Indeed, some of the submissions spoke as clearly in opposition to desegregation as did the legislature in Sec. 12 of Act 48 of 1970, M.C.L.A. § 388.182 ruled unconstitutional by the Sixth Circuit.

12. In such circumstances little weight or deference can be given to the unsupported submission of the State Board of Education. In light of the available alternatives and the facts produced at the hearing bearing on the issue, the court finds that State defendants offered no basis for ruling that the "initial operating zone" is the appropriate area within which to effectively desegregate the Detroit public schools.

13. Similarly, the newly intervening, defendant school districts did not attempt at the hearing to assist the court in determining which area was appropriate to accomplish effective desegregation. They were given the opportunity, by express written order and several admonitions during the course of the hearings, to assist the court in the task at hand but chose in their best judgment instead, in the main, to suggest their view that separate schools were preferable. The failure of the group of 40 districts to even comment that the court should exclude certain districts under any number of available rationales may in part be explained by the awkward position chosen by them and their counsel of having single representation for districts on different sides of the various suggested perimeters.

14. The plans of intervening defendants Magdowski, et al., and the defendant Detroit Board of Education are similar. With slight variations they include the entire tri-county, metropolitan Detroit area, with that area divided into several regions or clusters to make the planning for accomplishing desegregation more manageable. Although both have as their main objective desegregation, their larger area arises primarily from a heavy emphasis on such factors as white flight and an appropriate socio-economic balance in each cluster and school.[6]

15. The authors of the Detroit Board and Magdowski plans readily admit that the regions or clusters for pupil reassignment which involve Mt. Clemens and Pontiac are not directly related to desegregation of the Detroit public schools and may be disregarded without any substantial adverse effect on accomplishing our objective. No other party has expressed any disagreement with that

6. The Detroit Board plan places heavier reliance on white flight and socio-economic factors, while the Magdowski proposal in addition places an emphasis on maintaining a minimum percentage black in each school. These considerations in no way determine the court's choice of a desegregation area necessary to meet constitutional requirements. In fairness, however, it also should be noted that the desegregation area, which the court deems to best meet constitutional requirements, also happens in the main, to meet the other concerns expressed in these two proposals. That the Board's interest in socio-economic integration is largely met by racial desegregation is not surprising. There is uncontroverted evidence in the record, and the court so finds, that there is a high correlation between blacks and persons of a low socio-economic status, the result, in the main, of the cumulative effects of past and present racial discrimination including discrimination in education. At some point hereafter, of course, school authorities with responsibility for implementation and operation of the racially-unified non-discriminatory school system contemplated, or parts thereof, may and should include in its plan other educational goals and needs whether or not they are required by the law or any court. Swann v. Charlotte-Mecklenburg, 402 U.S. at 16, 91 S.Ct. 1267, 28 L.Ed.2d 554.

view. And the court finds that these two regions or clusters, for purposes of pupil reassignment, need not be included at this time in the desegregation area.

16. With the elimination of these two clusters there are, then, three basic proposals to be considered for the desegregation area: the State Proposal; the Detroit Board Proposal, and the proposal of defendant-intervenors Magdowski, et al. In addition, as noted, plaintiffs filed a modification of these three proposals.

17. Each of these proposals starts from the same two premises: (1) the tri-county area [7] constitutes the relevant school community which can serve as an initial benchmark in beginning the evaluation of how to effectively eliminate the racial segregation of Detroit schools; (2) but in some instances reasonable time and distance limitations for pupil transportation, and in other instances the actual area required to eliminate the pattern of racially identifiable schools, limit the area within which pupil reassignment should occur. In terms of proof, putting aside arguments of impotence by the State defendants, there was absolutely no contradictory evidence on these two criteria. The entire tri-county area includes areas, pupils, and schools in 86 school districts; it includes approximately one million students, of whom approximately 20% are black. Based on the evidence concerning school and non-school factors,[8] and reasonable time and distance limitations for pupil transportation, the court finds that both premises are accurate.[9]

18. The State Proposal includes the areas, pupils and school in 36 school districts; approximately 550,000 students are included of whom 36% are black. The Detroit Board Proposal (excluding clusters 8 and 12) includes the areas, pupils, and schools in 69 school districts; approximately 850,000 students are included, of whom 25% are minority.[10] The CCBE Proposal includes the areas, pupils, and schools in some 62 school districts; approximately 777,000 students are included of whom 197,000 (25.4%) are black. Plaintiffs' Proposal includes the areas, pupils, and schools in 54 school districts; approximately 780,000 students are included, of whom 197,000 (25.3%) are black.

19. The State Proposal approaches what may be considered a substantial

---

7. If a state is constitutionally forbidden to institute a system of racial segregation by the use of artificial boundary lines, it is likewise forbidden to perpetuate a system whose effect is to maintain segregation. "There is no legally protected vested interest in segregation. If there were, then Brown v. Board of Education and the numerous decisions based on that case would be pointless. Courts will not say in one breath that public school systems may not practice segregation, and in the next that they may do nothing to eliminate it." Wanner v. School Bd. of Arlington County, 357 F.2d 452, (Sobeloff, Cir. J.), pp. 454 and 455. The historic fact is that existing conditions are based on a design to segregate the races. To hold that segregation, once accomplished, is sacrosanct and beyond constitutional reach, is to say that the United States Constitution and its Amendments, and their provisions for equality, are mere rhetoric.

8. See Findings 70–78, infra.

9. The interplay of these two factors summarizes two other guideposts or starting points: maximum feasible desegregation and eliminating racially identifiable schools. Factors such as time and distance limitations, together with the rough definitions of substantial disproportion with the relevant school community's pupil racial composition, in turn largely determine the meaning of "eliminating racially identifiable schools" and what constitutes "maximum feasible desegregation," in the particular circumstances here present and in the context of a prior finding of segregation.

10. The Detroit Board Proposal contemplates desegregation on a "minority"-white basis. The proof in this cause, however, has been aimed at the segregation of black children and white children; similarly the remedy has been so defined, argued, and in the main presented by parties. The court finds, therefore, that the area, and further planning, should, in the main, be confined to a black-white breakdown.

disproportion in the context of this case. It is to be remembered that within any desegregation area, the racial composition of desegregated schools will vary from the area's racial mix. Given the variations in school plant, demographic and geographic factors, limiting the desegregation area to the State Proposal would result in some schools being substantially disproportionate in their racial composition to the tri-county area, and other schools racially identifiable, all without any justification in law or fact. This finding is supported by the lack of any apparent justification for the desegregation area described by the State Proposal except a desire to achieve an arbitrary racial ratio.

20. Transportation of children by school bus is a common practice throughout the nation, in the state of Michigan, and in the tri-county area. Within appropriate time limits it is a considerably safer, more reliable, healthful and efficient means of getting children to school than either car pools or walking, and this is especially true for younger children.

21. In Michigan and the tri-county area, pupils often spend upwards of one hour, and up to one and one half hours, one-way on the bus ride to school each day. Consistent with its interest in the health, welfare and safety of children and in avoiding impingement on the educational process, state educational authorities routinely fund such transportation for school children. Such transportation of school children is a long-standing, sound practice in elementary and secondary education in this state and throughout the country. And the court finds such transportation times, used by the state and recommended here, are reasonable in the circumstance here presented and will not endanger the health or safety of the child nor impinge on the educational process. For school authorities or private citizens to now object to such transportation practices

raises the inference not of hostility to pupil transportation but rather racially motivated hostility to the desegregated school at the end of the ride.

22. The Plaintiffs' Proposal made reference to P.M. 8, based on the TALUS regional transportation and travel times study. Although there was dispute over the meaning of the study, such studies are deemed sufficiently reliable that major governmental agencies customarily rely on their projection for a variety of planning functions. When used by the plaintiffs, P.M. 8, in conjunction with the Detroit Board's survey of maximum school to school travel times, served as a rough guideline within which the plaintiffs' modification of other proposals attempted to stay in an effort to provide maximum desegregation without any more transportation time than is required to desegregate. This court finds that the utilization of these two factors, and the lower travel time estimates which should result, is a reasonable basis for the modification in the circumstances of this case. The court's duty and objective is not to maximize transportation but to maximize desegregation and within that standard it will always be reasonable to minimize transportation. To that end the court has accepted the more conservative perimeter for the desegregation area suggested as a modification by plaintiffs because it provides no less effective desegregation.

23. Based on these criteria, the State Proposal is too narrowly drawn.

24. Based on these criteria, parts of the Detroit Board Proposal are too sweeping.

25. Based on these criteria, the CCBE Proposal and the Plaintiffs' Proposal, roughly approximate the area so described.[11]

26. There is general agreement among the parties, and the court so finds, that on the west the areas,

---

11. To the Southwest, Plaintiffs' Proposal falls on the side of less time in transit than the 40-minute guideline because in-clusion of more area is not required to desegregate. (See Finding 27, infra.)

schools, and pupils in the Huron, Van Buren, Northville, Plymouth, and Novi districts [12] (1) are beyond the rough 40-minute travel time line; (2) are not necessary to effectively desegregate schools involved in the regions and clusters abutting those schools; and, (3) at this writing, are not otherwise necessary, insofar as pupil assignment is concerned, to provide an effective remedy now and hereafter. (See Findings 63–69 below.)

27. In the southwest the school districts of Woodhaven, Gilbralter, Flat Rock, Grosse Ile and Trenton are within reasonable time and distance criteria set forth above. These virtually all-white districts are included in the Detroit Board Proposal but excluded from the plaintiffs' modification. The areas, schools and pupils in such school districts are similarly not necessary to effectively desegregate. (Clusters 13, 14, and 15 in Plaintiffs' Proposal are 20.-5%, 24.4% and 22.7% black respectively.) There is nothing in the record which suggests that these districts need be included in the desegregation area in order to disestablish the racial identifiability of the Detroit public schools. From the evidence, the primary reason for the Detroit School Board's interest in the inclusion of these school districts is not racial desegregation but to increase the average socio-economic balance of all the schools in the abutting regions and clusters. In terms of what this court views as the primary obligation established by the Constitution—racial desegregation—the court deems the proper approach is to be more conservative: the court finds it appropriate to confine the desegregation area to its smallest effective limits. This court weighs more heavily the judicially recognized concern for limiting the time and distance of pupil transportation as much as possible, consistent with the constitutional requirement to eliminate racially identifiable schools, than a concern for expanding the desegregation area to raise somewhat the average socio-economic balance of a relatively few clusters of schools.[13]

28. To the north and northeast, the only major disagreement among the Detroit Board Proposal and plaintiffs [1] modification relates to the areas, schools, and pupils in the Utica School District. This district is a virtually all-white, long, relatively narrow area extending several miles in a north-south direction away from the city of Detroit. Only the southern part of the district is within the rough, TALUS 40-minute travel time line.

29. The Detroit Board argues that Utica should be included in order to raise the average socio-economic balance of the abutting clusters and schools. In this instance, however, the overall racial composition of the cluster, 27.0% black, may tend toward disproportionate black relative to the tri-county starting point.

30. Mr. Henrickson, the planner for the Board, also suggested that Cluster 3 of Plaintiffs' Proposal, because of its omission of Utica, might present some problems, which he admitted could be solved, in designing a plan of pupil reassignment for the desegregation of schools. (See Findings 34–39 below.)

31. In light of these relevant, and competing, considerations the question presented by the Utica situation is close; however, at this writing, the

12. Moreover, in the main, the areas, schools, and pupils in these districts are not as fully members of the greater Detroit school community: many are less urban; they are the furthest in terms of time, distance, and contact from the Detroit area's economic and social activities; and many are more oriented, if anything, to urban areas other than Detroit, for example, the Ann Arbor—Ypsilanti area.

13. The court notes, however, that the range of average socio-economic status for the various regions or clusters in Plaintiffs' Proposal is similar to that in the Detroit Board Proposal: based on the Michigan Assessment the range in Plaintiffs' Proposal happens to be 44.7 to 53.7, while in the Detroit Board Proposal the range is 46.3 to 53; and only three of the 15 clusters of schools in Plaintiffs' Proposal fall below 46.3.

court determines that the areas, schools, and pupils in the Utica School District need not be included, and therefore, should not be included in the desegregation area.[14]

32. The court finds that the appropriate desegregation area is described by plaintiffs' modification of the three primary proposals. Within that area the racial identifiability of schools may be disestablished by implementation of an appropriate pupil desegregation plan. The area as a whole is substantially proportionate to the tri-county starting point. Within the area it is practicable, feasible, and sound to effectively desegregate all schools without imposing any undue transportation burden on the children or on the state's system of public schooling. The time or distance children need be transported to desegregate schools in the area will impose no risk to the children's health and will not significantly impinge on the educational process.

## B. Clusters

33. The Detroit Board Proposal makes use of 16 regions or clusters. These clusters range from 36,000 to 105,000 pupils and from 17.5% to 29.7% "minority." The clusters are arranged along major surface arteries and utilize the "skip," or noncontiguous zoning, technique to minimize the time and distance any child need spend in transit. The use of these clusters basically subdivides the planning for pupil reassignment within the desegregation area into a series of smaller, manageable and basically independent plans. Thus, although as the new intervenors suggest devising a desegregation plan for a system with some 800,000 pupils has never been attempted, the practical and manageable reality is that desegregation plans for systems with from 36,000 to 100,000 pu-

pils has been done and such plans have been implemented.

34. Plaintiffs' Proposal uses the same cluster technique and the same clusters, modified to fit the desegregation area. The 15 clusters range from 27,000 to 93,000 pupils and from 20.5% to 30.8% black. Only three relevant objections were raised by Mr. Henrickson, to the clusters as modified.

35. First, Cluster 4 was challenged as "concealing" a "problem," namely effective desegregation of other schools resulting from the omission of Utica from plaintiffs' modification. On cross-examination Mr. Henrickson admitted that the "problem" of actual pupil desegregation for these other schools could be "solved," that all schools within Cluster 4 could be effectively desegregated, and that Cluster 4 was smaller than the Detroit Board Cluster 6. The objection was thus narrowed to the possibility that a suburban high school constellation feeder pattern might have to be split between two Detroit high school constellation feeder patterns in order to desegregate. Several of the Detroit Board's clusters, however, also contain two Detroit high school feeder patterns.

36. This objection, splitting an existing feeder pattern, was raised directly in reference to Cluster 12. In neither instance, however, did Mr. Henrickson suggest that the time or distance of transportation involved was too long or that it would present administrative difficulty in devising a pupil assignment plan for either cluster. The objection relates solely to a matter of administrative convenience, namely the use of existing feeder patterns in preparing pupil assignments. For example, Mr. Henrickson previously admitted that in drawing a pupil assignment plan, an alternative to use of existing feeder patterns would be to "wipe the slate clean,"

---

14. Because of the closeness of the question, particularly as it relates to any problems which may arise hereafter in establishing a pupil desegregation plan,

the court feels that some opportunity should be given to the expert panel to suggest a modification of this tentative resolution. See also Findings 34–38 below.

and disregard existing feeder patterns. In fact one of the State plans suggested use of census tracts as an alternative.[15] On numerous occasions in the past Mr. Henrickson himself has reassigned parts of one feeder pattern to another school in order to relieve overcrowding and/or accomplish desegregation. The objection to such practice, therefore, is admittedly insubstantial.

37. The third objection relates to the exchange of Detroit Northern for Detroit Murray in Clusters 6 and 15 requiring that the students transported, if they proceed on their entire journey by way of the expressway, encounter an interchange which tends to be rather slow-moving. Such transportation time and distance, however, is well within the rough criteria for reasonableness and is shorter than or comparable to the maximum trips required in the Detroit Board's clusters. In other instances, Mr. Henrickson admitted that pupils in the Detroit proposal might also have to travel through similar interchanges. Moreover, the objection to this particular increase in travel time must be weighed against the apparent general decrease in time which would be required in plaintiffs' modified clusters as compared with the Detroit Board's clusters. In any event the desegregation panel, based on its investigation of all aspects of pupil assignment, remains free to suggest a modification of these clusters in order to reduce the time and number of children requiring transportation.

38. With that caveat, the court finds that plaintiffs' modification of the Detroit Board's clusters provides a workable, practicable, and sound framework for the design of a plan to desegregate the Detroit public schools.

## C. Pupil Assignment and Transportation

39. Example of various methods of pupil assignment to accomplish desegregation have been brought to the attention of the court by the parties: pairing, grouping, and clustering of schools; various strip, skip, island, and non-contiguous zoning; various lotteries based on combinations of present school assignment, geographic location, name, or birthday. Judicious use of these techniques—coupled with reasonable staggering of school hours and maximizing use of existing transportation facilities—can lead to maximum actual desegregation with a minimum of additional transportation.

40. Quite apart from desegregation, under any circumstances, transportation for secondary pupils living more than $1\frac{1}{2}$ miles, and elementary pupils living more than one mile from school, is often demanded by parents and should be provided. Moreover, it is essential to the effectiveness of any desegregation plan that transportation be provided free to all students requiring it under that criteria. (Brewer v. Norfolk Board of Education, 456 F.2d 943 (April 1972) (4th ucation, 456 F.2d 943 (4th Cir. 1972).

41. In the recent past more than 300,000 pupils in the tri-county area regularly rode to school on some type of bus; this figure excludes the countless children who arrive at school in car pools, which are many, many times more dangerous than riding on the school bus.

42. Throughout the state approximately 35–40% of all students arrive at school on a bus. In school districts eligible for state reimbursement of transportation costs in the three affected counties, the percent of pupils transported in 1969–70 ranged from 42 to 52%.

43. In comparison approximately 40%, or 310,000, of the 780,000 children within the desegregation area will require transportation in order to accomplish maximum actual desegregation.

44. Hence, any increase in the numbers of pupils to be transported upon implementation of a complete desegregation plan over the number presently

---

15. A common practice in other cases is the use of "pupil locator" maps. See North-

cross v. School Board of City of Memphis, 444 F.2d 1184 (6th Cir. 1971).

transported, relative to the state and the tri-county area, should be minimal. Indeed, any increase may only reflect the greater numbers of pupils who would be transported in any event but for the state practice, which affected the segregation found in this case, and which denies state reimbursement to students and districts wholly within city limits regardless of the distance of the child from the school to which assigned.[16] (Ruling on Issue of Segregation at 14.) The greatest change is the direction of the buses.

45. There is uncontradicted evidence that the actual cost of transportation for a two-way plan of desegregation should be no greater than 50 to 60 dollars per pupil transported,[17] comparable to the present costs per pupil through the state. Increases in the total costs of pupil transportation in the desegregation area, therefore, will result primarily from providing all children requiring transportation a free ride instead of imposing the costs of transportation for many on the families in districts which are ineligible for state reimbursement and which fail to provide transportation.

46. By multiple use of buses, careful routing, and economies of scale resulting from a comprehensive system of pupil transportation, it may be possible to achieve savings in per pupil costs. For example in 1969–1970 many school districts in the tri-county area which used the same bus for even two loads per day lowered their per pupil costs to $40 or less. In a coordinated, urban pupil transportation system it may be possible to raise the bus use factor to three or more. (See "First Report" State Survey and Evaluation.)

47. In the tri-county area in the recent past there were approximately 1,800 buses (and another 100 smaller vans) used for the transportation of pupils. Assuming a rough average of 50 pupils per bus carrying three loads of students per day, this transportation fleet may prove sufficient to carry some 270,000 pupils.

48. Various public transit authorities now transport an additional 60,000 pupils on their regular public runs.

49. The degree to which these plausible bus-use factors can be realized to their maximum, and whether these public transit facilities may be fully utilized in a plan of desegregation, must be answered upon careful investigation by a panel of experts.

50. There is no disagreement among the parties, and the court so finds, that additional transportation facilities, at least to the number of 350 buses, will have to be purchased to meet the increase in the number of students who should be provided transportation for either an interim or final plan of desegregation.

51. For all the reasons stated heretofore—including time, distance, and transportation factors—desegregation within the area described is physically easier and more practicable and feasible, than desegregation efforts limited to the corporate geographic limits of the city of Detroit.

52. The issue of transportation of kindergarten children, and their inclusion in part or in full in the desegrega-

16. For years these city-contained school districts, which include some suburban districts in the desegregation area, as well as the Detroit Public Schools, have demanded without success that this inequitable state practice be changed so that all districts could be reimbursed on the same basis for pupil transportation.

17. The figure almost twice that which appears in several of the State "plans" was based on the assumption that busing would be "one-way" with black children being assigned to suburban schools. Mr. Wagner, the state official in charge of pupil transportation, provided the information on which that estimate was based and also informed his superiors that a two-way plan of desegregation and transportation would cost much less per pupil. The State defendants did not bring this important fact to the court's attention in any of their submissions; it was uncovered and fully explored in the deposition of Mr. Wagner taken by plaintiffs.

tion plan, may require further study. There was general agreement among the experts who testified that kindergarten, but for "political" considerations, should be included, if practicable, in the desegregation plan. Kindergarten, however, is generally a half-day program. Transportation of kindergarten children for upwards of 45 minutes, one-way, does not appear unreasonable, harmful, or unsafe in any way. In the absence of some compelling justification, which does not yet appear, kindergarten children should be included in the final plan of desegregation.

53. Every effort should be made to insure that transportation and reassignment of students to accomplish desegregation is "two-way" and falls as fairly as possible on both races. Although the number of black and white children transported and reassigned at the outset will be roughly equal, it is inevitable that a larger proportion of black children will be transported for a greater proportion of their school years than white children, if transportation overall is to be minimized. To mitigate this disproportion, every effort should be made at the outset to randomize the location of particular grade centers. In the short term, full utilization of vastly under-capacity inner-city schools may also help to mitigate the disproportion for some black children; and in the long term, new school capacity, consistent with other constitutional commands and the overall needs of the desegregation area and the surrounding area, should be added in Detroit, in relative proximity to concentrations of black student residence.

D. Restructuring of Facilities and Reassignment of Teachers

54. In the reassignment of pupils to accomplish desegregation the court finds that facilities must be substantially reallocated and faculty substantially reassigned by reason of the clustering, pairing and grouping of schools.

55. In order to make the pupil desegregation process fully effective the court finds that it is essential to integrate faculty and staff and to insure that black faculty and staff representation at every school is more than token. The court has previously found and reaffirms that "a quota or racial balance in each school which is equivalent to the system-wide ratio and without more" is educationally unsound, and that the desideratum is the balance of staff by qualifications for subject and grade level, and then by race, experience and sex. It is obvious, given the racial composition of the faculty and staff in the schools in the metropolitan plan area, and the adjusted racial composition of the students, that vacancies and increases and reductions in faculty and staff cannot effectively achieve the needed racial balance in this area of the school operation. Active steps must be taken to even out the distribution of black teachers and staff throughout the system.

56. In the desegregation area approximately 16% of the faculty and 12% of the principals and assistant principals are black. In this context "token" means roughly less than 10% black. Moreover, where there is more than one building administrator in any school, a bi-racial administrative team is required wherever possible.

57. Every effort should be made to hire and promote, and to increase such on-going efforts as there may be to hire and promote, additional black faculty and staff. Because of the systematic and substantial under-employment of black administrators and teachers in the tri-county area, an affirmative program for black employment should be developed and implemented.

58. The rated capacity of classrooms in the Detroit public schools is 32; in some of the suburban districts the average rated capacity is as low as 24 or 25. Utilization should be redetermined on a uniform basis.

59. In respect to faculty and staff, school facilities, and the utilization of existing school capacity, normal administrative practice in handling the substantial reallocation and reassignment inci-

dent to pupil desegregation should produce schools substantially alike.

60. In the circumstances of this case, the pairing, grouping and clustering of schools to accomplish desegregation with minimum transportation often requires use of grade arrangements such as K–4, K–5, or even K–6. In so planning pupil reassignments, it is sometimes necessary, and often administratively practicable, to include grades K–8 or even K–9 to achieve the maximum actual desegregation with the minimum transportation. Grade structures in most elementary schools in the desegregation area is a basic K–6; however, almost all other combinations are found. They differ within and among various districts.

61. In the reassignments of pupils and teachers and the reallocation of equipment and facilities required to accomplish desegregation, the elementary grades and schools present relatively few administrative difficulties, while the high school grades and facilities present the greater difficulties, particularly with respect to scheduling and curriculum.

62. For these reasons, if it develops that interim choices must be made because of the impossibility of immediate desegregation of all grades, schools, and clusters in the desegregation area, the weight of the evidence is, and the court so finds, that desegregation should begin first at the earliest grades for entire elementary school groupings throughout as many clusters as possible.

E. School Construction

63. Relative to suburban districts the Detroit public schools, as a whole, are considerably over-capacity. (See also Finding 58, *supra*.) To alleviate this overcrowding, equalize rated capacity and minimize and equalize transportation burdens borne by black pupils in the city, needed new school capacity, consistent with other requirements of a desegregation plan, should be added on a priority basis in the city of Detroit.

64. Relevant to the court's choice of a desegregation area more limited than

the Detroit Board Proposal is the testimony, elicited on cross-examination from two of the primary authors of that proposal, related to the effects of controlling new school construction. The broader area in the Detroit proposal was chosen without any real consideration of the impact of controlling school construction in an area larger than the desegregation area. Upon reflection, both Dr. Flynn and Mr. Henrickson admitted that closely scrutinizing and limiting the addition of capacity to areas outside the desegregation area might lead them to re-evaluate the need, in the context of maintaining now and hereafter a unitary system, to include an area as sweeping as recommended by the Detroit Board Proposal.

65. In our Ruling on Issue of Segregation, pp. 8–10, this court found that the "residential segregation throughout the larger metropolitan area is substantial, pervasive and of long standing" and that "governmental actions and inaction at all levels, Federal, State and local, have combined with those of private organizations, such as loaning institutions and real estate associations and brokerage firms, to establish and to maintain the pattern of residential segregation through the Detroit metropolitan area." We also noted that this deliberate setting of residential patterns had an important effect not only on the racial composition of inner-city schools but the entire School District of the City of Detroit. (Ruling on Issue of Segregation at 3–10.) Just as evident is the fact that suburban school districts in the main contain virtually all-white schools. The white population of the city declined and in the suburbs grew; the black population in the city grew, and largely, was contained therein by force of public and private racial discrimination at all levels.

66. We also noted the important interaction of school and residential segregation: "Just as there is an interaction between residential patterns and the racial composition of the schools, so there is a corresponding effect on the residen-

tial pattern by the racial composition of schools." Ruling on Issue of Segregation at 10. *Cf.* Swann v. Charlotte-Mecklenberg, 402 U.S. 1, 20–21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554 (1971); "People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods."

67. Within the context of the segregatory housing market, it is obvious that the white families who left the city schools would not be as likely to leave in the absence of schools, not to mention white schools, to attract, or at least serve, their children.[18] Immigrating families were affected in their school and housing choices in a similar manner. Between 1950 and 1969 in the tri-county area, approximately 13,900 "regular classrooms," capable of serving and attracting over 400,000 pupils,[19] were added in school districts which were less than 2% black in their pupil racial composition in the 1970–71 school year. (P.M. 14; P.M. 15).

68. The precise effect of this massive school construction on the racial composition of Detroit area public schools cannot be measured. It is clear, however, that the effect has been substantial.[20] Unfortunately, the State, despite its awareness of the important impact of school construction and announced policy to control it, acted "in keeping generally, with the discriminatory practices which advanced or perpetuated racial segregation in these schools." Ruling on Issue of Segregation at 15; see also id., at 13.

69. In addition to the interim reevaluation of new school construction required in the order, pursuant to the State Board's own requirements, the final plan will consider other appropriate provisions for future construction throughout the metropolitan area.

F. Governance, Finance and Administrative Arrangements

70. The plans submitted by the State Board, the Detroit Board, and the intervening defendants Magdowski, et al., discuss generally possible governance, finance, and administrative arrange-

---

18. This phenomenon was noted in Swann, 402 U.S. 1, 20–21. The principle was long known, and actively, supported by the F.H.A. For example, consider that public agency's early understanding in its 1936 manual that white subdivision developments require white schools: "if the children of people living in such area are compelled to attend school where the majority or a good number of the pupils represent a far lower level of society or an incompatible racial element, the neighborhood under consideration will prove far less stable and desirable than if the condition did not exist."

19. This figure assumes 30 children/regular classroom. Although rated capacities may be lower, the figure for regular classrooms does not include several types of instructional, recreational, laboratory, and other rooms which add overall pupil capacity to schools.

20. The resulting pattern is unmistakable: "Residential segregation within the city and throughout the larger metropolitan area is substantial, pervasive and of long standing. Black citizens are located in separate and distinct areas within the city and are not generally found in the suburbs. While the racially unrestricted choice of black persons and economic factors may have played some part in the development of this pattern of residential segregation, it is, in the main, the result of past and present practices and customs of racial discrimination, both public and private, which have and does restrict the housing opportunities of black people. Perhaps the most that can be said is that all of them [various governmental units], including school authorities, are, in part, responsible for the segregated condition which exists." Ruling on Issue of Segregation, 8 and 10. Moreover, an examination of PX 181, 192 and 185 shows that black children often remain isolated in predominately black schools in the few suburban school districts with any numbers of black pupils. In the last several weeks the local press has reported that the United States Office of Education cut off funds for one such district.

ments [21] which may be appropriate for operation of an interim or final plan of desegregation. Without parsing in detail the interesting, and sometimes sensible, concepts introduced by each plan, it is sufficient to note that each contemplates overlaying some broad educational authority over the area, creating or using some regional arrangement (with continued use or eventual redrawing of existing districts), and considerable input at the individual school level. The court has made no decision in this regard and will consider the matter at a subsequent hearing.

71. Each concept needs to be "fleshed-out" in the hard prospect of implementation of a final plan of desegregation and what is necessary and essential, and only that, for the successful operation of that plan of school desegregation now on an interim basis and hereafter on a permanent footing.

72. There are now some 86 school districts in the tri-county area of varying size, numbers of pupils, shapes, and wealth.

73. In another context, the State Board of Education found each related to a "metropolitan core city" (Detroit) as "city," "town," or "urban fringe" districts.

74. The boundaries of these school districts in general bear no relationship to other municipal, county, or special district governments, needs or services.[22]

21. Included in this set of arrangements are contract relationships of various types concerning personnel, property and debts.

22. The defendant, William G. Milliken, Governor of the State of Michigan, in his amicus brief filed in the Supreme Court of the United States, San Antonio Independent School District v. Demetrio P. Rodriguez, 406 U.S. 966, 92 S.Ct. 2413, 32 L.Ed.2d 665, says, page II:

"1. Amici, whose individual and particular interests are set forth in more detail below, are the Governors of the above-listed States. As Governors and chief executive officers of their respective States, Amici are responsible for upholding and carrying out the commands of the Constitutions and laws of their various States, including the provisions thereof requiring the establishment of public schools and school districts and commanding the children of their States to attend school. Amici are responsible for financial decisions affecting all State operations, including those pertaining to support and financing of the public schools.

"Amici are deeply concerned about the ongoing and continuing crisis in public education and the difficulties facing public educational systems in their States and around the nation. Amici recognize that grave inequities exist because of variation in local property tax bases upon which local school districts must rely in order to support their school systems. Amici believe that these inequalities in educational resources violate the requirements of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and that these inequalities must be eliminated * * * *"

The Governors' amicus brief, speaking of the State of Texas, could as well be said of the State of Michigan, when it used these words:

"It is also undisputed that the local school districts and their boundaries, and hence the aggregate value of the property they contain, are entirely the creation of and their maintenance is the responsibility of the State of Texas. Furthermore, the detailed regulation of public education financing in Texas * * * is a state not a local responsibility. Indeed, the school districts have the power to raise funds for education only as a result of delegation by the State of its own power to tax for the general welfare." (Page 8 of brief.)

"Since the State could not discriminate directly against students residing in poorer localities, it should not be permitted to accomplish the same result by dividing its responsibility for equal education with local school districts and failing to supplement the funds raised by the school districts sufficiently to eliminate discrimination." * (Page 11 of brief.)

* Compare Griffin v. County School Board, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964). While a State may delegate certain of its functions to smaller subdivisions such as cities or counties, it cannot escape accountability for their actions. Such subdivisions are "created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them * * * The number, nature, and duration of [their] powers * * * and the territory over which they shall be exercised rests in the absolute discretion of the state." Hunter v. City of Pittsburg, 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907).

75. Some educational services are already provided to students on an inter-district, county, intercounty, or metropolitan basis; and many support services are provided by the intermediate school districts and the State Department of Education. For various reasons many pupils already cross school district lines to attend school or receive educational services.[23]

76. In many respects—patterns of economic life, work, play, population, planning, transportation, health services —the tri-county area constitutes a rough series of interrelated communities constituting, in the view of the United States Census Bureau, a single standard metropolitan statistical area.

77. Local units of government in the metropolitan area have in many instances joined together for the purpose of providing better solutions to problems confronting them. In such instances various units of government have either disregarded local boundaries or have concluded that the problems were such as to call for a metropolitan solution. In some cases they have created overlay organizations. SEMCOG, recreational authorities, a metropolitan sewage system, SEMTA, and the Detroit Water System are examples of these metropolitan approaches.

78. Indeed, the State defendants at this very moment are attempting in state court to strike down one irrationality, and the discriminatory effect, of the existing school district arrangement, i. e., finance, apparently in the hope of moving to a virtual state-wide assumption of costs.

79. In such circumstances there has been no showing that the existing school district boundaries are rationally related to any legitimate purpose; and the court finds that the particular welter of existing boundaries for 86 school districts is not necessary to the promotion of any compelling state interest.

80. On the basis of the present record, the court is of the view that the shifts in faculty, staff, resources and equipment and the exchanges of pupils necessary to accomplish maximum actual desegregation may be made, at least on an interim basis, by contractual agreements or otherwise among and between the existing school districts. The court has serious reservations, however, whether such procedures will inevitably threaten the continuing effectiveness of a plan of desegregation over the long-term. On these issues more evidence and further hearings will be necessary before reaching a final decision.

81. The State defendants, and in particular the State Board of Education which is charged with the primary responsibility for public education in Michigan, are the primary parties to be charged with responsibility to undertake that vital inquiry and return with recommendations about those governance, financial, and administrative arrangements which are necessary and essential to the successful implementation of a plan of desegregation on an interim and continuing basis.

G. Involvement of Affected Persons and Communities and Protection Against Racial Discrimination in the Desegregation Process

82. The court has received uncontroverted evidence in the plans filed by every party and in testimony, and advice in several briefs amicus curiae, and the court finds, that the following additional factors are essential to implementation and operation of an effective plan of desegregation in the circumstances of this case:

(a) Bi-racial councils made up of the parents and staff, and, where appropriate, pupils, should be set up at each school; the persons most affected must be encouraged and given every opportunity to partic-

---

23. For years black children in the Carver School District were assigned to black schools in the inner city because no white suburban district (or white school in the city) would take the children.

ipate in the implementation of desegregation.

(b) Curriculum content, and all curriculum materials and student codes, must be re-evaluated and reflect the diversity of ethnic and cultural backgrounds of the children now in the schools. As far as possible, those immediately affected by these decisions at the individual school level should participate in that process.

(c) In-service training for faculty and staff for multi-ethnic studies and human relations should be required; we must, after all, rely primarily on our teachers and children to respect, nurture, and deal with the diversity of students present in the desegregated school.

(d) The entire grading, reporting, counselling, and testing program should be reviewed in light of desegregated schools compared to traditional schools and to avoid imposing the effects of past discrimination on the children. Tracking, whether so labeled or by any test, which has racial effects should not be utilized; within schools a pattern of classes which are substantially disproportionate in their racial composition from the relevant school or grade mix should be closely scrutinized and maintained only if necessary to promote a compelling educational objective.

83. In making the finding above, we remind the parties that this court's task is to enforce constitutional rights not to act as a schoolmaster; the court's task is to protect the constitutional rights here found violated with as little intrusion into the education process as possible. The court's objective is to establish the minimum constitutional framework within which the system of public schools may operate now and hereafter in a racially unified, non-discriminatory fashion. Within that framework the body politic, educators, parents, and

most particularly the children must be given the maximum opportunity to experiment and secure a high quality, and equal, educational opportunity. However, experience has proven that specific goals, deadlines and methods of reporting and review must be required in all desegregation cases to insure compliance.

## H. Timing

84. The burden remains with State defendants to show why desegregation for all schools, grades, classrooms, and pupils in the desegregation area should not proceed now, i. e., in the context of this litigation, for the 1972 fall term. The design and implementation of desegregation plans for all grades in 15 clusters—including pupil assignments, necessary reassignment of faculty and restructuring of facilities, planning and acquiring the needed transportation facilities—is conceded by all parties to be a major undertaking. Yet next fall will already be a full year, not just four or six or even eight weeks, Cf. Carter v. West Feliciano Parish School Bd., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), after the initial ruling by this court of the need for maximum feasible desegregation "now." In such circumstances the burden to prove the infeasibility of implementation of complete relief is high.

85. The desegregation panel, therefore, must make every effort to plan to implement as much actual desegregation, for as many clusters, schools, grades, classrooms, and students as possible.

86. At a minimum, there is agreement among, and evidence from, the experts that desegregating several grades, and more particularly entire elementary schools, within many, if not all clusters, may be accomplished in the fall.

87. In view of Findings 60 to 62, supra, if hard choices must be made for the fall, any interim plan should attempt to desegregate grades K–6, K–8, or K–9 in as many entire clusters as possible; and, in the absence of some other showing, there appears no reason why a com-

plete plan may not be implemented by fall 1973.[24]

88. A heavy burden rests with those who seek delay in any way, shape, kind, degree or extent to convince the court that maximum actual desegregation cannot proceed effectively forthwith.

89. In view of the time constraints, the need to discharge this burden forthwith, the State defendants' default in assisting this court to determine the appropriate desegregation area, and the State defendants' asserted and evident lack of available planning capacity suited to the task, the court finds that some additional entity must be charged with the task of preparing a pupil assignment plan to accomplish maximum actual desegregation and a transportation plan within the framework this day established. To that end a panel of skilled experts, broadly representative of the parties and their interests, appointed by the court and assigned that task, is required to discharge effectively and promptly these two tasks.

90. State defendants remain charged with the duty, however, of coming forward with other necessary reports and plans concerning those governance, administrative, and financial arrangements necessary and essential to the implementation of an effective plan of desegregation on an interim and on-going basis.

### I. The Plan

91. Based on the entire evidence amassed in this case, the court finds that an educationally sound, administratively feasible, constitutionally adequate, practicable and effective plan of deseg-

regation may be developed, implemented and operated hereafter for the desegregation area as set forth in findings 1–90 above.

### CONCLUSIONS OF LAW

1. The court has continuing jurisdiction of this action for all purposes, including the granting of effective relief. Bradley v. Milliken, Ruling on Issue of Segregation, September 27, 1971; Findings of Fact and Conclusions of Law on Detroit-Only Plans of Desegregation, March 28, 1972.

2. A de jure segregation violation having been found, the minimum remedy is maximum actual desegregation, taking into account the practicalities of the situation.[25] Bradley v. Milliken, Oral Order, October 4, 1971; Findings of Fact and Conclusions of Law on Detroit-Only Plans of Desegregation, March 28, 1972; Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), 349 U.S. 294 (1954).; Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); Carter v. West Feliciano School Bd., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970); Swann v. Charlotte-Mecklenberg Bd. of Ed., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Board of School Commissioners of Mobile, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); Davis v. School District of City of Pontiac, 443 F.2d 573, cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L.Ed.2d 186 (1971).

---

24. These findings are made on the basis of the present record and are subject to modification based on evidence which may be developed once the specific problems of actual desegregation are faced in the planning process.

25. See, Kelley, et al. v. Metropolitan Bd. of Educ., 463 F.2d 732, page 744, May 30, 1972:

"Perhaps the primary thing that the Swann case decided was that in devising plans to terminate such residual effects, it is appropriate for the school system

and the District Judge to take note of the proportion of white and black students within the area * and seek as practical a plan as may be for ending white schools and black schools and substituting therefor schools which are representative of the area in which the students live."

* The area referred to in this case is all of Davidson County, including the City of Nashville, which is included in the jurisdiction of defendant Metropolitan Board of Education.

■ 3. The remedial obligation rests with school authorities; but where in any way they fail, or are unable because of the circumstances of the case, to fulfill any part of the obligation promptly and fully, the court has broad equity power, and the duty, to insure that demonstrable progress be made now; that a schedule for planning be adopted forthwith; and that necessary planning be specifically ordered and immediately undertaken in order that a constitutionally adequate plan may be fashioned and finally ordered implemented as soon as possible. Swann v. Charlotte-Mecklenburg Board of Education, 311 F.Supp. 265 (W.D.N.C.1970), aff'd, 402 U.S. 1, 91 S.Ct. 1267, 28 L. Ed.2d 554 (1971); Carter v. West Feliciano School Bd., 396 U.S. 226, 227–228, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969), 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970); Acree v. County Board of Education, 458 F.2d 486 (5th Cir. 1972); Rule 53, Fed.R.Civ.P.; P. A. R. C. v. Pennsylvania, 334 F.Supp. 1257, 1266–7 (E.D.Pa.1971). Only then will the court in this case be apprised fully of the practicalities of the situation, and what is reasonable and feasible, in order that a final order may issue. School authorities, of course, will be given an opportunity to (1) raise relevant objections, (2) make suggestions for modifications, (3) or present an alternative plan of desegregation; and their judgment and expertise will be considered and given appropriate weight by the court.

■ 4. Funds must either be raised or reallocated, where necessary, to remedy the deprivation of plaintiffs' constitutional rights and to insure that no such unconstitutional neglect recurs again. Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Goldberg v. Kelly, 397 U.S. 254, 265–266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 788, 28 L.Ed.2d 113 (1971); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); Graham v. Richardson, 403 U.S. 365, 374–375, 91 S.Ct. 1848, 29 L.Ed.2d 534

(1971); Mayer v. Chicago, 404 U.S. 189, 197, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971); Griffin v. Prince Edward County, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Hoosier v. Evans, 314 F.Supp. 316, 320–321 (D.St.Croix, 1970); United States v. School District 151, 301 F.Supp. 201, 232 (N.D.Ill.1969), aff'd as modified, 432 F.2d 1147 (7th Cir. 1970), cert. denied, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971); Plaquemines Parish School Board v. U. S., 415 F.2d 817 (5th Cir. 1970); Bradley v. Richmond, 325 F.Supp. 828 (E.D.Va. 1971); Brewer v. Norfolk, 456 F.2d 943 at pp. 946, 947 (4th Cir., 1972). It would be a cruel mockery of constitutional law if a different rule were to be applied to school desegregation cases. After all schooling is this nation's biggest industry and the most important task of government left to the states by the Constitution. In this case, were a different rule to be applied, it would constitute a gigantic hypocrisy: After all the money which has been spent over the years creating and maintaining the segregated condition, the relatively small amounts of money required to undo that segregation can be found. The law, surely, requires at least that. And the application of the commands of *Swann* does require that in almost every school desegregation case which has been brought to this court's attention.

■ 5. In the substantial reassignment of faculty and restructuring of facilities required by the clustering, pairing, and grouping of schools to accomplish pupil desegregation, normal administrative practice should lead to schools with substantially like facilities, faculty and staff, and equipment. *Swann, supra,* 402 U.S. at 18–20, 91 S. Ct. 1267, 28 L.Ed.2d 554. Moreover, special care should be taken in the necessary reassignment of faculty to avoid creating or maintaining the racial identification of schools "simply by reference to the racial composition of teachers and staff." *Swann, supra,* 402 U.S. at 18, 91 S.Ct. at 1277. In any event, the equitable discretion of the court is broad

enough to insure that those aspects of faculty desegregation and equalization of facilities which are essential to the effective operation of a desegregation plan are included in the planning and final order, *Swann, supra,* 402 U.S. at 15, 91 S.Ct. 1267, 28 L.Ed.2d 554; U. S. v. Montgomery County Board of Ed., 395 U.S. 225, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Hecht v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944); and no contract, union agreement or otherwise, or Board policy or practice may impede these Fourteenth Amendment obligations. U. S. v. Greenwood Municipal Separate School District, 406 F.2d 1086, 1094 (5th Cir. 1969), cert. denied, 395 U.S. 907, 89 S.Ct. 1749, 23 L. Ed.2d 220 (1969); Berry v. Benton Harbor, (W.D.Mich.1971).

6. The Federal courts have repeatedly rejected plans exempting the lower grades from integration, relying less on educational data than upon the hard legal fact that segregation at any age is a denial of the equal protection of the law. See, *e. g.,* United States v. Jefferson County Bd. of Educ., 372 F.2d 836 (5th Cir. 1966), aff'd on rehearing en banc, 380 F.2d 385 (5th Cir. 1967). To leave grades K through 3 exempt from a desegregation plan is not to eliminate segregation "root and branch." Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed. 2d 716 (1968).

7. The consistent application of settled constitutional law invests this court with the equitable power, and the duty, to order preparation, and thereafter implementation, of a practicable and sound plan which embodies the principles set forth in these findings and conclusions and the attached memorandum and order. See, generally, Ruling on Propriety of Considering a Metropolitan Remedy to Accomplish Desegregation of the Public Schools of the City of Detroit, March 24, 1972; Findings of Fact and Conclusions of Law on Detroit-Only Plans, March 24, 1972; oral ruling on offers of proof, April 13, 1972; and the cases cited therein.

8. School construction practices throughout the metropolitan area have added to and reinforced the pattern of segregation referred to. Although there were vacant seats throughout the city to which students could have been assigned at lesser cost and with the achievement of integration, continued sums were expended for construction of new schools designed to service particular areas of racial concentration, and such schools opened as and have continued to be racially identifiable in violation of the Fourteenth Amendment. Swann v. Charlotte-Mecklenberg Bd. of Educ., 402 U.S. 1, 18–20, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); United States v. School Dist. 151, 404 F.2d 1125, 1132–33 (7th Cir. 1968); Davis v. School Dist. of Pontiac, 309 F.Supp. 734, 741–42 (E.D. Mich.1970), aff'd, 443 F.2d 573 (6th Cir. 1971); Spangler v. Pasadena City Bd. of Educ., 311 F.Supp. 501, 517–18 (C.D. Calif.1970); Johnson v. San Francisco Unified School Dist., 339 F.Supp. 1315, 1325 (N.D.Calif.1971) (Appendix A, Memorandum and Order Requiring the Parties to File Plans for School Desegregation, April 28, 1971); Brewer v. School Board of the City of Norfolk, 397 F.2d 37, 42 (4th Cir. 1968); *Cf.* Sloan v. Tenth School Dist. of Wilson County, 433 F.2d 587 (6th Cir. 1970); United States v. Board of Educ. of Polk County, (4th Cir. 1968); Kelley v. Altheimer, 378 F.2d 483 (8th Cir. 1967); Bradley v. School Bd., 325 F.Supp. 828 (E.D.Va. 1971); Clark v. Board of Educ. of Little Rock, 401 U.S. 971, 91 S.Ct. 1187, 28 L. Ed.2d 321 (1971).

9. The legal effects of racially discriminatory confinement to a school district are not different from the effects of such containment within a district. *E. g.,* Lee v. Macon County Board of Education, 448 F.2d 746 (5th Cir. 1971); Haney v. County Board Sevier, 410 F.2d 920 (8th Cir. 1969), 429 F.2d 364 (8th Cir. 1970).

10. Where the actions of state defendants and local school authorities throughout the metropolitan area have had the natural, foreseeable, and

actual effect of building upon, taking advantage of, and encouraging racially segregated demographic patterns deliberately fixed by governmental action at all levels with the effect of creating and maintaining racial segregation in the public schools, there is a present obligation to eliminate the continuing effects of such violation; and the District Court has the duty, upon default by school authorities, to intervene to secure compliance with the Constitution pursuant to the sound exercise of traditional equity powers consistent with the practicalities of the local situation. Swann v. Charlotte-Mecklenberg, 402 U. S. 1, 15–16, 20–21, 31–32, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). *Cf.* Findings of Fact and Conclusions of Law on Detroit-Only Plans of Desegregation, p. 5, Conclusion 4. In devising remedies where state-imposed segregation has been established, it is the responsibility of school authorities and district courts to see to it that future school construction and abandonment is not used and does not serve to perpetuate or re-establish the violation. *Swann, supra,* 402 U.S. at 21, 91 S.Ct. 1267, 28 L.Ed.2d 554.

■ 11. Moreover, where the State, and named defendants, are substantially implicated in the segregation violation found and are ultimately responsible for public schooling throughout the state, the consistent application of constitutional principles requires that this court take all steps necessary and essential to require them to desegregate the Detroit public schools effectively and maintain, now and hereafter, a racially unified, non-discriminatory system in the absence of a showing that the judicial intervention here contemplated will frustrate the promotion of a legitimate and compelling state policy or interest. Reynolds v. Sims, 377 U.S. 533, 575, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Hunter v. City of Pittsburg, 207 U.S. 161, 178–179, 28 S.Ct. 40, 52 L.Ed. 151 (1907); Phoenix v. Kolodziejski, 399 U.S. 204, 212–213, 90 S.Ct. 1990, 26 L.Ed.2d 553 (1970); Kramer v. Union Free School District, 395 U.S. 621, 633, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); Williams v. Illinois, 399 U.S. 235, 244–245, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1966); Green v. County School Bd., 391 U.S. 430, 439, 442, 88 S.Ct. 1689, 20 L.Ed.2d 716; Swann v. Charlotte-Mecklenberg, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Davis v. Bd. of School Commissioners, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Brown v. Board of Education, 349 U.S. 294, 300, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); Monroe v. Board of Commissioners, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968).