Dorothy **HOOTS**, Individually and as
mother of her children Janelle Hoots
and Jamie Hoots, et al., Plaintiffs,

v.

**COMMONWEALTH OF PENNSYL-
VANIA et al., Defendants.**

Civ. A. No. 71–538.

United States District Court,
W. D. Pennsylvania.

May 15, 1973.

See also, D.C., 334 F.Supp. 820.

R. Stanton Wettick, Jr., Neighborhood Legal Services, Pittsburgh, Pa., for plaintiffs.

Burton Morris, Deputy Atty. Gen., Harrisburg, Pa., Alfred C. Maiello, Thomas M. Rutter, Jr., Pittsburgh, Pa., for defendants.

## OPINION

WEBER, District Judge.

### INTRODUCTION

This is a suit under the federal Civil Rights Act in which plaintiffs, as representatives of a class, allege that residents of the Borough of Braddock, North Braddock and Rankin, in Allegheny County, Pennsylvania, have been deprived of rights, privileges and immunities guaranteed them by the laws and Constitution of the United States by being forced to attend and send their children to a racially segregated school district created by the actions of the various defendants in preparing, approving and adopting plans of reorganization and consolidation of school districts in Allegheny County, particularly that creating the General Braddock Area School District, known as Administrative Unit No. 16, within whose boundaries these plaintiffs reside, and the approval of reorganization of surrounding school districts made at about the same time.

A great many of the factual issues in this case were resolved by agreement and stipulation. The statistical data submitted into evidence of the trial was received largely without objection. The defendants submitted two documents as exhibits but offered no testimony. As a result we find the facts to be almost entirely in accord with those findings proposed by plaintiffs' counsel after the close of the evidence. The findings are sufficiently detailed so as to allow us to proceed without a further narrative ac-

count of the background of this litigation.

### FINDINGS OF FACT

#### A. *Parties*

1. Plaintiffs include Addrallace Knight and Barbara Smith.

2. Plaintiff Addrallace Knight is a black woman who has resided in the Borough of Braddock, Pennsylvania, for 20 years and is the mother of three children presently enrolled in the public schools of the General Braddock Area School District in grades 2, 4 and 12, of three children formerly enrolled and still eligible to be enrolled in the public schools of the General Braddock School District, and of two children in college who graduated from the School Districts of Braddock and the General Braddock Area, respectively.[1] T. 2, T. 30.

3. Plaintiff Barbara Smith is a black woman who has resided in the Borough of Braddock for 28 years and is the mother of children enrolled in the public schools of the General Braddock Area School District in grades 3, 4, 5, 9, 10 and 11. T. 63, 64.

4. Plaintiffs Addrallace Knight and Barbara Smith instituted this suit to alter the boundaries of the General Braddock Area School District. T. 30, 63.

5. Named Plaintiffs bring the suit as a class action on behalf of all parents and children residing in the boroughs of Braddock, North Braddock and Rankin. Named Plaintiffs' claims are typical of the claims of the class and named Plaintiffs will fairly and adequately protect. the interests of the class. T. 40, 46, 100, 101.

6. Defendant Commonwealth of Pennsylvania has the duty under Article III, Section 14 of the Pennsylvania Constitution, P.S., to maintain and support a thorough and efficient public school system. (Paragraph 35 of Plaintiffs' Complaint, Admitted.)

7. Defendant Commonwealth of Pennsylvania has the ultimate power, authority and responsibility to create school districts and to establish and alter boundaries of the areas served by said school districts. (Paragraph 36 of Plaintiffs' Complaint, Admitted.)

8. Defendant Pennsylvania State Board of Education ["State Board"] is a state administrative board charged with the general supervision and control of the educational interests of the Commonwealth of Pennsylvania, and Defendant W. Deming Lewis is the Chairman of that Board. (Paragraphs 33 and 34 of Plaintiffs' Complaint, Admitted.)

9. Defendant Allegheny Intermediate Unit Board of School Directors is an administrative body which became operative as of July 1, 1971 and is charged with providing the essential services formally provided by the Allegheny County Board of School Directors ["County Board"] and with the administration of the program of services of Intermediate Unit 3 comprising all school districts in the County of Allegheny outside of the City of Pittsburgh, and Defendant Edward X. Hallenberg is the President of such Board. (Paragraphs 38(b) and 38(c) of Plaintiffs' Complaint, Admitted.)

#### B. *School Reorganization Legislation and Standards.*

10. During the 1960's the Pennsylvania Legislature on three occasions enacted legislation to reorganize the administrative units (i. e. school districts) in Pennsylvania's public school systems.

(a) the first Act—the Act of September 12, 1961, P.L. 1283, No. 561, 24 P.S. § 2–281 et seq. (Act 561)—directed each county board of school directors to prepare on or before January 1, 1963 a plan of organization of administrative units for the County for review by the State Council of Education. 24 P.S. §§ 2–282, 2–283.[2] S. 1.

(b) Act 561 was superseded by the Act of August 8, 1963, P.L. 564, No. 299, 24 P.S. § 2–290 ct seq. (Act 299).

---

1. "T."_____ refers to the page of the Transcript of Trial.

2. The reference to "S"_____ means the paragraph of the Stipulation of Facts, Ex. 61 of the record.

Act 299 directed each county board of school directors to prepare on or before July 1, 1964 a plan of organization of administrative units for the county and directed the State Council of Basic Education to review organization plans prepared by the county boards and to approve such plans as it deemed wise in the best interest of the educational system of the Commonwealth, provided that these plans met certain requirements specified in Act 299. 24 P.S. §§ 2–292, 2–293. S. 2. In preparing reorganization plans pursuant to Act 299, the county boards were not bound by any proposals contained in reorganization plans prepared pursuant to Act 561, 24 P.S. § 2–292. In dealing with school districts which had previously entered into a written agreement for the establishment of a joint school or department, however, the county boards were prohibited from proposing any administrative units which in whole or in part comprised less than all of the school districts joined by such agreement. 24 P.S. § 2–292.

(c) Act 299 was superseded by the Act of July 8, 1968, P.L. 299, No. 150, 24 P.S. § 2400.1 et seq. (Act 150). Act 150 directed each county board of education to prepare within 90 days a plan of organization of administrative units limited to those school districts within the county which were not in an administrative unit established as a school district under Act 299. 24 P.S. § 2400.2. S. 14.

11. Acts 299 and 150 both provided for the plan of organization of administrative units to conform to standards for approval of administrative units adopted by the State Board and directed the State Board to prepare such standards, taking into account the following factors: topography, pupil population, community characteristics, transportation of pupils, use of existing buildings, existing administrative units, potential population changes and the capability of providing a comprehensive plan of education. 24 P.S. §§ 2400.1 and 2400.2; 24 P.S. §§ 2–291 and 2–292. Both Acts also provided that no plan of organization of administrative units should include any proposed school district with a pupil population of less than 4000 unless the factors listed above were considered by the State Board (or Council of Basic Education) as requiring approval of a plan in which any district contained a pupil population of less than 4000. 24 P.S. § 2400.3, 24 P.S. § 2–293.

12. Pursuant to the above provisions of Acts 299 and 150, the State Board adopted Standards for Approval of Administrative Units. These Standards, *inter alia* provided that:

(a) An administrative unit shall make available an educational program and educational opportunities to meet the varying needs, aptitudes, abilities, and interests of individuals residing in the administrative unit.

(b) Consideration should be given to whether a geographic area has developed the characteristics of a community. Community, as used here, includes one or more municipalities and the surrounding territory from where people came for business, social, recreational, fraternal or similar reasons. Neither race or religion shall be a factor in determining administrative unit boundaries and differences in the social and economic level of the population shall not be a basis to determine these boundaries.

A letter from the Superintendent of the Department of Public Instruction advised the County Boards, including the Allegheny County Board, that the intent of the language of the last sentence of the above paragraph was to prevent de jure segregation through the fixing of school district boundaries and that the language was not to be construed to permit de facto segregation on the basis of race, religion or national origin which is by law prohibited. Exhibit 40, T. 271–276.

(c) An administrative unit shall utilize existing buildings to the maximum extent practical avoiding unnecessary new construction where possible.

(d) Pupil population changes may be considered in the planning of administrative units where the changes are

supported by reliable studies of area development showing past pupil population trends and future projections based on recognized statistical methods.

(e) Consideration shall be given to the capability of providing a comprehensive program of education which shall mean the ability to educate and train each child within his capacity to the extent demanded by the immediate requirements of his growth and his relationship to the strengthening of this Commonwealth and nation, and shall include, but not be limited to, wealth per pupil, qualifications of professional staff, enrollment and diversification of curriculum.

Exhibits 12, 60.

### C. *School Districts Established by the State and County Boards*

13. In the central eastern area of Allegheny County, east of the City of Pittsburgh and north of the Monongahela River, the County and State Boards established the General Braddock Area School District; the School Districts of Turtle Creek, Swissvale Area, Churchill Area and East Allegheny which border on the General Braddock Area School District; and the Edgewood School District which is situated within approximately one mile of the General Braddock Area School District. Exhibits 59, 13, 4, 10.

14. The General Braddock Area School District came into being on July 1, 1971 and serves the area consisting of the geographic limits of the Boroughs of Braddock, North Braddock and Rankin. This School District composed of Braddock, North Braddock and Rankin was proposed in the organization plan adopted by the County Board pursuant to Act 150 on October 7, 1968 and was approved by the State Board on May 9, 1969. Prior to July 1, 1971, the School Districts of Braddock, North Braddock and Rankin served the Boroughs of Braddock, North Braddock and Rankin, respectively. S. 15, 21, 24, 26; Ex. 10, 13, 37.

15. The Turtle Creek School District serves the area consisting of the geographic limits of the Boroughs of East Pittsburgh and Turtle Creek. This School District was established pursuant to Act 150. S. 15; Ex. 9, 10, 37.

16. The Swissvale Area School District serves the area consisting of the geographic limits of the boroughs of Braddock Hills and Swissvale. This School District was established pursuant to Act 150. S. 15; Ex. 9, 10, 37.

17. The Churchill Area School District serves the area consisting of the geographic limits of the municipalities of Chalfont, Churchill, Forest Hills and Wilkins. This School District was established pursuant to Act 299. S. 15; Ex. 4, 10, 13, 36.

18. The East Allegheny School District serves the area consisting of the geographic limits of the municipalities of East McKeesport, North Versailles, Wall and Wilmerding. This School District was established pursuant to Act 299. S. 15; Ex. 4, 10, 13, 36.

19. The Edgewood School District serves the area consisting of the geographic limits of the Borough of Edgewood. This School District was established pursuant to Act 150. S. 15; Ex. 9, 10, 13, 37.

### D. *Characteristics of Braddock, North Braddock and Rankin.*

20. Braddock, North Braddock and Rankin are economically depressed, declining communities. T. 47, 48, 66, 120, 135–137.

21. The housing within these three municipalities is old and substandard. Ex. 23, 49; T. 50, 134–135.

22. The residents of these municipalities are poor and less educated. Ex. 20, 50, 51, 56.

23. The municipal taxes of these municipalities are higher than average. Ex. 25.

24. The recreational and shopping facilities within these three municipalities are extremely limited. T. 49–50, 65, 134, 135.

25. The populations of these three municipalities have been rapidly declining at an accelerated pace and becoming increasingly older. From 1930 to 1970 the combined populations of Braddock, North Braddock and Rankin declined from 44,067 to 23,335 and the median age of these populations increased from approximately 27 years in 1940 to approximately 35 years in 1970. Ex. 15, 16.

26. The Boroughs of Braddock, North Braddock and Rankin have no characteristics that will attract or retain persons who have the financial means and opportunity to live elsewhere. T. 47, 48, 64–66, 120, 220, 221, 225–228; Findings of Fact 20–25.

### E. Population Trends—Race

27. The populations of Braddock, North Braddock and Rankin are becoming increasingly non-white at an accelerated rate. From 1930 to 1970 the percentages of the non-white populations of Braddock, North Braddock and Rankin increased as follows: Braddock—11.54% to 36.33%; North Braddock—2.91% to 11.04%; Rankin—19.56% to 35.48%; and combined populations—9.7% to 24.7%. The largest increase in the non-white percentage of the combined populations of Braddock, North Braddock and Rankin has occurred in the last two decades as is shown in the table below which sets forth the increase in the percentage of non-white population for each of the past four decades:

| | 1930–1940 | 1940–1950 | 1950–1960 | 1960–1970 |
|---|---|---|---|---|
| Braddock | .7% | 4.0% | 7.3% | 12.8% |
| North Braddock | .2% | 1.8% | 2.4% | 3.8% |
| Rankin | 2.2% | 7.3% | 5.0% | 1.4% |
| Combined 3 | .8% | 3.7% | 4.1% | 6.4% |

Ex. 15

28. The increase in the percentages of the non-white populations of Braddock, North Braddock and Rankin is attributable almost entirely to a declining white population within these municipalities. From 1930 to 1970 the white pop- ulations of these three boroughs de- creased as follows:

| | 1930 White Population | 1970 White Population | Loss |
|---|---|---|---|
| Braddock | 17,096 | 5,527 | 11,569 |
| North Braddock | 16,290 | 9,641 | 6,649 |
| Rankin | 6,391 | 2,462 | 3,929 |
| Combined Population | 39,777 | 17,630 | 22,147 |

Ex. 15.

The greatest portion of the loss in the white populations of these municipalities has occurred in the last two decades as shown in the table below which sets forth the average yearly decline in the white population for each of the past four decades:

| | Average Yearly Decline | | | |
|---|---|---|---|---|
| | 1930–1940 | 1940–1950 | 1950–1960 | 1960–1970 |
| Braddock | 101 | 228 | 438 | 399 |
| North Braddock | 109 | 120 | 176 | 260 |
| Rankin | 55 | 92 | 152 | 94 |
| Combined Loss | 265 | 440 | 766 | 744 |

Ex. 15

29. Over the past four decades there has been an even greater increase in the non-white percentages of the public school populations of Braddock, North Braddock and Rankin. From 1930 to 1972 the non-white percentages of the public school populations of these municipalities increased as follows:

| | % of Non-White Enrollment | | | |
|---|---|---|---|---|
| | 1930 | 1960 | 1970 | 1972 |
| Braddock | 8% | 41% | 72% | 80% |
| North Braddock | 2% | 8% | 16% | 22% |
| Rankin | 17% | 34% | 51% | 57% |
| Combined | 7.1% | 23.7% | 38.7% | 44.5% |

Ex. 18

| | Yearly Increase in Non-White Enrollment | | |
|---|---|---|---|
| | 1930–1960 | 1960–1970 | 1970–1972 |
| Braddock | 1.1% | 3.1% | 4% |
| North Braddock | .2% | .8% | 3% |
| Rankin | .6% | 1.7% | 3% |
| Combined | .5% | 1.5% | 3% |

Ex. 18

30. This substantial increase in the non-white percentages of the public school populations of Braddock, North

---

3. This shows the increase in the non-white percentage of the combined populations of Brad- dock, North Braddock and Rankin.

Braddock and Rankin is attributable almost entirely to a steady decline in the white public school populations of Braddock, North Braddock and Rankin over the past 42 years:[4]

White Public School Populations

|  | 1930 | 1960 | 1970 | 1972 |
|---|---|---|---|---|
| Braddock | 3,085 | 1,096 | 332 | 198 |
| North Braddock | 4,400 | 2,481 | 1,955 | 1,576 |
| Rankin | 1,617 | 685 | 398 | 295 |
| Combined | 9,102 | 4,262 | 2,685 | 2,069 |

Ex. 18

Average Yearly Decline in White Public School Populations

|  | 1930–1960 | 1960–1970 | 1970–1972 |
|---|---|---|---|
| Braddock | 66 | 76 | 67 |
| North Braddock | 64 | 53 | 190 |
| Rankin | 32 | 29 | 52 |
| Combined | 162 | 158 | 309 |

Ex. 18

31. This Court relies on the uncontradicted testimony of expert witness John A. Finger that there is no basis for believing that the characteristics which caused the decline in the white populations of Braddock, North Braddock and Rankin over the past years have changed; that while all white families may not move out, new white families will not move in and there will be fewer and fewer young white children; that it is extremely likely that these municipalities have reached the tipping point of becoming primarily a black area; and that Braddock and Rankin will become 100% black or nearly so and North Braddock will develop the same characteristics unless remedial action is taken as to the General Braddock Area School District because of the relationship of school population to residential neighborhood stability.[5] T. 219–228.

32. This Court finds that the creation of the General Braddock Area School District is an unstable influence on the public school populations of Braddock, North Braddock and Rankin that will cause an increasing number of white students to leave the public schools of Braddock, North Braddock and Rankin.[6] T. 40, 104, 288.

33. On the basis of findings of fact 20 through 32, this court finds that there is every reason to believe that the white public school populations of Braddock, North Braddock and Rankin will continue to decline by at least the same number as over the past several years and that the enrollment of the General Braddock Area School District will be

4. From 1930 to 1972 the black public school populations of Braddock, North Braddock and Rankin increased from 696 to 1656.

5. This testimony is also supported by the data in Exhibit 16 which shows that the white populations of Braddock, North Braddock and Rankin are much older than the black populations of these municipalities; that the younger segments of the populations are becoming increasingly non-white; and that, in fact, the non-white percentage of the combined populations of these municipalities between the ages of 0–14 is twice as great as the non-white percentage of the combined populations over the age of 44.

6. In its 1936 Underwriter's Manual the FHA recognized that the development of a neighborhood is strongly influenced by the type of schools:

"if the children of people living in such an area are compelled to attend school where the majority or a goodly number of the pupils represent a far lower level of society or incompatible racial element, the neighborhood under consideration will prove far less stable and desirable than if this condition did not exist." Bradley v. School Board of City of Richmond, Virginia, D.C., 338 F. Supp. 67, at 215–216. Also see Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, at 20–21, 91 S.Ct. 1267, 28 L.Ed.2d 554.

Note also that in the last two years the annual decline in the white public school populations of Braddock, North Braddock and Rankin doubled primarily because in North Braddock (the source of 76% of General Braddock Area School District's white students) the annual decline in white students increased from 53 to 190. See Finding of Fact 30.

Also see United States v. Board of School Commissioners, Indianapolis, Ind., D.C., 332 F.Supp. 655, at 676, where the Court said:

"The undisputed evidence in this case . . . is that when the percentage of Negro pupils in a given school approaches 40, more or less, the white exodus becomes accelerated and irreversible."

almost entirely black within the next five to ten years.

F. *Comparison with Neighboring Municipalities.*

34. The area served by the General Braddock Area School District has perhaps the highest concentration of blacks of any area within Allegheny County served by a single school district. As of 1970 Braddock, Rankin and North Braddock ranked first, second and eleventh, respectively, of the 129 municipalities within the County in terms of their percentage of black residents. Ex. 14

35. This central eastern portion of Allegheny County is generally divided along racial lines. The black residents of this portion of the County are contained within Braddock, North Braddock and Rankin and largely excluded from other municipalities within the area. This is illustrated by the following table which sets forth the black populations as of 1970 for Braddock, North Braddock, Rankin and the other municipalities within the area:

| | Black | Total | % Black |
|---|---|---|---|
| Braddock | 3139 | 8682 | 36.16 |
| North Braddock | 1194 | 10,838 | 11.02 |
| Rankin | 1351 | 3817 | 35.39 |
| Chalfont | 12 | 1370 | .88 |
| Churchill | 5 | 4690 | .11 |
| East McKeesport | 26 | 3233 | .80 |
| Braddock Hill | 293 | 2494 | 11.75 |
| East Pittsburgh | 116 | 3006 | 3.85 |
| Edgewood | 66 | 5101 | 1.29 |
| Forest Hills | 26 | 9561 | .27 |
| North Versailles | 1025 | 13,416 | 7.64 |
| Swissvale | 567 | 13,891 | 4.10 |
| Turtle Creek | 15 | 8,308 | .18 |
| Wall | 32 | 1,265 | 2.53 |
| Wilkins | 49 | 8,479 | .56 |
| Wilmerding | 94 | 3,218 | 2.92 |

36. Pervasive racial discrimination which restricts the housing opportunities of blacks in the eastern portion of Allegheny County is a factor which accounts for the concentration of blacks within Braddock, North Braddock and Rankin. T. 42–43, 70–77; Affidavits of Brock, Cox, DeCostro, Strader.

37. The percentage of non-white enrollment of the General Braddock Area School District is much greater than that of any of the surrounding school districts. As of 1971 the percentages of non-white enrollment of the General Braddock Area School District and surrounding school Districts were as follows:

| | |
|---|---|
| General Braddock Area School District | 44.98 |
| Churchill | .78 |
| Edgewood | 6.08 |
| East Allegheny | 8.89 |
| Turtle Creek | 1.3 |
| Swissvale | 9.6 |

Ex. 17

38. The General Braddock Area School District also has a much greater non-white enrollment than almost every other school district within the entire county. As of 1971 of the 46 school districts operating within Allegheny County (excluding Pittsburgh)[7], only 15 districts had a non-white enrollment in excess of 5%, only eight districts had a non-white enrollment in excess of 10%, only 4 districts had a non-white enrollment in excess of 30%[8], and only two districts—Wilkinsburg and General Braddock Area— had a non-white enrollment in excess of 40%. Ex. 17

39. The school districts in the vicinity of Braddock and Rankin continually sought to avoid being included in a school district with Braddock and Rankin because of the high concentration of blacks within the Braddock and Rankin School Districts. These surrounding districts proposed to the County and

7. Pittsburgh is excluded because for organization of administrative units and other purposes the jurisdiction of the County Board covers all Allegheny County school districts except Pittsburgh.

8. Of the four districts with a non-white enrollment in excess of 20% (Wilkinsburg, General Braddock Area, Clairton and Duquesne), the General Braddock Area School District was the only newly created school district. The boundaries of the School Districts of Wilkinsburg, Clairton and Duquesne are identical to the municipal boundaries of these municipalities and these boundaries were not affected by school reorganization within Allegheny County. (Exhibit 13)

State Boards mergers that would include almost any school districts in the vicinity other than Braddock and Rankin. S. 4, 7, 9, 10, 17, 18; Ex. 5, 7, 8; 35A (p. 11), 42, 46, 47; T. 82–85, 93–100, 107–108, 120–122.

40. The General Braddock Area School District is racially identifiable as a black school district. Findings of Fact 34–39; S. 17, 18; T. 40, 46, 84, 93–95, 98–100, 104, 246, 247, 268–272, 276.

### G. Alternatives to a school district of Braddock, North Braddock and Rankin.

41. Braddock, North Braddock and Rankin are not geographically isolated; they are easily accessible to most other municipalities within this central eastern portion of the County; and they have not historically developed the characteristics of a single community (defined by the Standards for Approval of Administrative Units—Ex. 12—as one or more municipalities and the surrounding territory from which people come for business, social, recreational, fraternal or social reasons). Thus alternatives to a school district comprised of Braddock, North Braddock and Rankin were available to the County and State Boards. Ex. 8, 59; T. 45, 88, 116–119, 131, 133–134.

42. One such alternative was a school district composed of Braddock, North Braddock, Rankin, East Pittsburgh and Turtle Creek. Such a school district as of 1967 would have had an enrollment of 5894 of which approximately 27% would have been non-white. Ex. 17.

The plan of organization of administrative units prepared by the County Board pursuant to Act 299 proposed a school district composed of these five municipalities. The minutes of a meeting of the County Board which discussed this proposed school district state that all members of the Board agreed that this was a satisfactory unit and that this unit met the standards for pupil population, utilization of existing buildings and capabilities of providing comprehensive education. Also a report prepared by the Department of Public Instruction described a unit consisting of these five municipalities as "a natural".[9] S. 3, Ex. 8, 45.

43. A second alternative was a school district composed of Braddock, North Braddock, Rankin, Braddock Hills and East Pittsburgh.

The plan of reorganization of administrative units prepared by the County Board pursuant to Act 561 proposed a school district composed of these five school districts. A report prepared by the County Board in connection with the preparation of this plan stated that a district composed of these five municipalities would make possible the placement of every pupil—grades 7, 8 and 9—in a bona fide junior high school and that all senior pupils could have an expanded high school program. S. 1, Ex. 35 (p. 10); T. 83–84.

44. A third alternative was one school district composed of Swissvale, Rankin, Braddock Hills and perhaps Edgewood and a second school district composed of Braddock North Braddock, Turtle Creek and East Pittsburgh. A school district composed of Swissvale, Rankin, Braddock Hills and Edgewood as of 1967 would have had an enrollment of 3940 of which approximately 14% would have been non-white and a school district composed of Braddock, North Braddock, Turtle Creek and East Pittsburgh would have had an enrollment of 5280 of which approximately 24% would have been non-white.[10] Ex. 17

All witnesses familiar with this area of Allegheny County testified that for

---

9. None of these five municipalities was in a unit established pursuant to Act 299 so the provisions of Act 150 which protected established school districts did not preclude a district composed of these five municipalities. Ex. 4, 10.

10. None of these municipalities was in a unit established pursuant to Act 299 so the provisions of Act 150 protecting established school districts did not preclude the Boards from proposing the alternative suggested in finding of fact 44.

geographic reasons alone, Rankin should be in the school district which included Swissvile rather than a school district which included Braddock. The feasibility of placing Rankin in the school district which included Swissvale is so obvious that William Rea, a member of the State Board who heard the appeal of the Rankin School District from the County Board's plan which combined Braddock, North Braddock and Rankin into one school district, asked if there was any way the State Board could find out why the County put Rankin with Braddock and North Braddock "rather than the logical geographical thing, looking at the map, of Swissvale because it seems to me that the State Board needs to have some reasons here." T. 88, 131, 134; Ex. 54 (p. 23); Ex. 59.

45. A review of the map of this central eastern area of Allegheny County indicates that at least from the standpoint of transportation, other alternatives (in addition to the three mentioned above) to a school district composed of Braddock, North Braddock and Rankin could also have been selected. Ex. 59, Ex. 11.

H. *Refusal to Properly Consider Race.*

■ 46. On the basis of the uncontradicted testimony presented by plaintiffs' expert witnesses, this Court finds that in establishing boundary lines for school districts, the racial composition of the student body of the proposed school district is an important factor to be considered to maximize the social and educational benefits which accrue from attending a racially integrated school system and to minimize the foreseeable and avoidable adverse social and educational effects which result from attending racially segregated schools. T. 162, 163, 232–234, 264–5; Ex. 58, 41.

47. On the basis of the uncontradicted testimony presented by plaintiffs' expert witnesses, this court finds that there is no educational or other valid justification for disregarding racial criteria in establishing school district

boundary lines. T. 162–168, 234–239, 271–275.

■ 48. In preparing and adopting the plan of organization of administrative units which combined Braddock, North Braddock and Rankin into one school district pursuant to Act 150, the County and State Boards refused to give consideration to the foreseeable and avoidable adverse educational and racial effects that could result from the concentration of black pupils within this proposed school district. S. 19, 23.

49. This court finds that if the County and State Boards had properly considered race in preparing and approving a plan of organization of administrative units for Allegheny County pursuant to Act 150, these Boards would not have approved a plan which combined Braddock, North Braddock and Rankin into a single school district. In support of this finding, this court relies on the uncontradicted testimony of plaintiffs' expert witnesses that had race been properly considered, for educational reasons alone the Boards would not have concentrated the black residents of this area within this one school system. T. 162, 166–168, 244, 268–271, 276–277.

50. This Court accepts the uncontradicted testimony of plaintiffs' expert witnesses that on the basis of the demographic data which was clearly available, the State and County Boards knew or should have known they were creating a racially segregated school district as of the dates they proposed and approved a school district composed of Braddock, North Braddock and Rankin. T. 219–224, 230–232, 251–253, 276–277.

Demographic data available to these Boards as of such dates included information on the racial composition of the public schools of Braddock, North Braddock and Rankin and surrounding school districts (S. 6, 17, 22, Ex. 47) as well as data of the U. S. Census Bureau and public schools of Braddock, North Braddock and Rankin showing the population trends by race of the public school popu-

lations and general populations of Braddock, North Braddock, Rankin and surrounding areas. (See, for example, Exhibits 15, 16 and 18).

Merely by considering the data collected by the County Board and Department of Public Instruction showing the white and non-white enrollment in each school district within Allegheny County as of 1964 and 1967 (Exhibit 17), the County and State Boards should have known that a school district of Braddock, North Braddock and Rankin would be a racially segregated school district that would become increasingly non-white. As of 1967, Braddock, Rankin and North Braddock ranked 1, 2 and 7 of the 61 school districts in Allegheny County (excluding Pittsburgh) in terms of percent of non-white enrollment and, as the table below shows, were the only school districts within this central eastern portion of Allegheny County with a significant concentration of non-white students:

| Percent of non-white students | | |
|---|---|---|
| | 1964 | 1967 |
| Braddock | 56.69 | 63.84 |
| North Braddock | 14.22 | 19.62 |
| Rankin | 44.7 | 51.30 |
| East Pittsburgh | 14.15 | 6.08 |
| Turtle Creek | 0.00 | 0.00 |
| Swissvale | 5.5 | 9.91 |
| Edgewood | 0.00 | 0.00 |
| Churchill | .17 | 0.41 |
| East Allegheny | — | 9.88 |

Ex. 17

51. The County and State Boards maximized racial segregation within the public schools of this central eastern portion of Allegheny County by creating a school district composed of Braddock, North Braddock and Rankin. As of the dates on which the County Board prepared and State Board approved the combining of the school districts of Braddock, North Braddock and Rankin into a single school district, no other combination of school districts within this portion of Allegheny County would

have created a school district (of at least 4,000 pupils as required by Act 150) with as large a percentage of non-white enrollment as the combination of Braddock, North Braddock and Rankin. See Ex. 17.

I. *The Boards' plan disregarded Standards for School Reorganization as well as recognized educational standards.*

52. The plan of organization of administrative units adopted by the County and State Boards pursuant to Act 150 for the central eastern portion of Allegheny County failed to meet many essential requirements of Act 150, the State Board Standards for Approval of Administrative Units ("State Board Standards"), policies of the Department of Public Instruction and Human Relations Commission of Pennsylvania, and recognized educational standards. T 157–162, 235–241, 262–265, 268–272, 277–281. Examples of essential requests that weren't met include:

(a) Act 150 required that each proposed school district have a pupil population of at least 4000 (unless a smaller school district was required). See Finding of Fact 11. The plan adopted by the County and State Boards completely disregarded this requirement by combining the school districts of East Pittsburgh and Turtle Creek which had a 1967 combined enrollment of 1898[11], by combining the school districts of Braddock Hills and Swissvale which had a 1967 combined enrollment of 1925 and by permitting to stand alone the school district of Edgewood which had a 1967 pupil population of 928, Ex. 37; T. 159–161, 239–241. Even the school district of Braddock, North Braddock and Rankin violated the spirit of this requirement because as of 1967 it was obvious that the enrollment within these districts (which was slightly in excess of 4000) was declining

11. It is noted that as of 1964 the County Board recognized that a school district of Turtle Creek and East Pittsburgh would not comply with the state pupil population requirements and therefore it refused to consider such a school district. Ex. 45, 6. At that time Turtle Creek-East Pittsburgh public school population was 2234. (Ex. 36.)

rapidly and that the pupil population of this district would stabilize at a population far below 4000.[12]

(b) The State Standards as well as recognized educational standards require creation of school districts capable of providing a comprehensive program of education. Finding of Fact 12e. Because of the concentration of non-white children from poor and educationally-deprived homes within the district, the General Braddock Area School District did not meet this requirement according to uncontradicted testimony of plaintiffs' expert witnesses. T. 161, 162, 241–246, 277–281.

(c) Guidelines of the Department of Public Instruction and the Human Relations Commission of Pennsylvania in effect prior to the County Board's preparation of the plan of administrative units pursuant to Act 150 (as well as accepted educational standards) recognize the importance of the presence of children from varied backgrounds within every school building. Such policy specifically provides that any action which fosters racial segregation in the public schools is against the public interest and should not be taken by any public agency. Ex. 58, 41. T. 264, 265. The County and State Boards acted contrary to these guidelines (as well as the policy expressed in the letter from the Superintendent of the Department of Public Instruction stating that de facto segregation on the basis of race is by law prohibited—(see finding of fact 12b) by concentrating black children and children from poor, educationally deprived homes within one single school district. T. 158–159, 234–238, 241–246, 258–265, 268–276, 283–284.

(d) The County and State Boards also ignored the State Board Standard requiring maximum utilization of existing buildings by separating East Pittsburgh from North Braddock because of North Braddock's need for school buildings sit-uated within East Pittsburgh. Finding of Fact 12c. Ex. 6, 7, 45.

53. Alternatives to a school district composed of Braddock, North Braddock and Rankin were available that would have been more consistent with the provisions of Act 150, the State Board Standards for Approval of Administrative Units and recognized educational standards. Such alternatives include those set forth in findings of fact 42–44. T. 157–162, 241–242, 244–246.

54. In view of the availability of these alternatives, the decision of the County and State Boards to create a school district composed of Braddock, North Braddock and Rankin was contrary to recognized education standards, the provisions of Act 150, the Standards for Approval of Administrative Units of the State Board, and policies of the Department of Public Instruction and Human Relations Commission. T. 157–162, 241–242, 244–246.

55. These alternatives previously referred to that would have been more consistent with the provisions of Act 150, the Standards for Approval of Administrative Units of the State Board, recognized education standards and the policies of the Department of Public Instruction and Human Relations Commission would have permitted the black public school population of Braddock, North Braddock and Rankin to attend substantially more integrated public school systems. Ex. 17, Findings of Fact 42, 44, T. 158–162.

### J. General Conclusions

■ 56. On the basis of Findings of Fact 27 through 55 and the uncontradictory testimony of plaintiffs' expert witnesses, this Court finds that by combining Braddock, North Braddock and Rankin into one school district, the County and State Boards created a racially segregated school district. T. 247, 276, 219–227, 246–247, 276–277, 262–271.

12. State Board standards permitted consideration of population changes. See Findings of Fact 12a.

57. On the basis of Findings of Fact 20 through 55 this Court finds that the natural, foreseeable and actual effect of combining Braddock, North Braddock and Rankin into one school district was to perpetuate, exacerbate and maximize racial segregation within the public schools of this central eastern portion of Allegheny County.

58. On the basis of Findings of Fact 27 through 51 this Court finds that by combining the three municipalities within which most of the black population of the area resides into a single school district the County and State Boards built on the pattern of residential segregation within this central eastern portion of Allegheny County, the inevitable effect of which was to maintain, perpetuate, exacerbate, maximize and otherwise impose racial segregation in the public schools of this central eastern portion of the County.

59. On the basis of Findings of Fact 27 through 55 this Court finds that the County and State Boards devised this plan of organization of administrative units which combined Braddock, North Braddock and Rankin into one school district to satisfy the desires of as many of the surrounding municipalities as possible to be placed in a school district which did not include Braddock and Rankin. This Court can find no other explanation for the Boards' creating a school district composed of Braddock, North Braddock and Rankin and defendants have offered no explanation as to why this school district was created to refute the testimony of plaintiffs' expert witnesses that the creation of this school district cannot be justified under recognized educational standards, the provisions of Act 150 or the Standards for Approval promulgated by the State Board.

60. Because the State and County Boards in devising this plan of organization of administrative units for the central eastern portion of Allegheny County were influenced by the desires of the surrounding municipalities to avoid being placed in a school district with Braddock and Rankin because of the high concentration of blacks within these two municipalities, race was a factor, at least indirectly, in the formation of the school district composed of Braddock, North Braddock and Rankin.

61. The Record contains absolutely no evidence showing that the school district boundaries established in the County and State Boards' plan of organization of administrative units are rationally related to any legitimate purpose and this Court finds that such boundaries do not promote any valid state interest. T. 158–162, 239–242, 244–246, 277–281; Findings of Fact 20 through 55.

## DISCUSSION—JOINDER OF NECESSARY PARTIES

The only issue of law seriously contested in these proceedings has been the necessity of joinder of the school districts surrounding the General Braddock Area School District.

Fed.R.Civ.P. 19(a) requires the joinder of a party (1) whose absence prevents the granting of complete relief to the present parties, and (2) whose interest is such that his absence may impair his ability to protect that interest or submit the present party to multiply or inconsistent obligations.

The absence of the surrounding school districts does not affect the complete relief available to existing parties. The power to draw school district boundaries rests solely with the Commonwealth of Pennsylvania and the Pennsylvania State Board of Education. Local school districts have no power or control over their own boundaries. They can be altered at anytime by the Commonwealth. The surrounding school districts have no legal right to have their existing boundaries maintained and consequently they have no legal interest under the provisions of Fed.R.Civ.P. 19 which can be affected by the outcome of this litigation.

While surrounding school districts may be concerned with the results

of this litigation and even be affected by it, this does not require their joinder under Fed.R.Civ.P. 19.

In Griffin v. State Board of Education, 239 F.Supp. 560 [E.D.Va.1965] where public agencies were enjoined from paying tuition grants for use by private schools which practiced racial discrimination, it was held not necessary to join the private school's name. "The overriding answer is that no complaint is made against the schools themselves. The complaint is against the payers and not the ultimate recipients of the grant. It is. the power to give, not the right to receive, which is in issue." (p. 566). Permissive intervention was allowed to such private schools in Poindexter v. Louisiana Financial Assistance Commission, 258 F.Supp. 158 [E.D.La.1966], aff'd, 389 U.S. 571, 88 S.Ct. 693, 19 L. Ed.2d 780 [1968], the trial court stating: "These schools are not necessary parties, as far as the constitutionality of the tuition grant system is concerned." (p. 167).

We may note that the surrounding school districts were aware of this suit. The Attorney General of the Commonwealth of Pennsylvania sent letters on May 19, 1972 to four surrounding school districts informing them of the action and enclosing a copy of the complaint. He advised them that if relief were granted the present boundaries of their districts would undoubtedly be changed. He urged their immediate intervention. (Ex. 54, T. 4.) Also, a week before trial the Attorney General sent telegrams advising them that he would again move to compel their joinder, and urging them to intervene. (T. 3–4.) None chose to act.

We do not overlook the possibility that the adjoining districts may be required to be joined at some further stage of the proceedings, if such are necessary under our retention of jurisdiction of this matter. We shall provide in our order that the Commonwealth and the State Board allow the adjoining districts to be heard on the matter of developing a plan of desegregation.

We have, therefore, denied defendants' motions based on failure to join a necessary party under Fed.R.Civ.P. 19 up to the present stage of the proceedings.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action under 28 U.S.C. §§ 1331(a), 1343(3) and (4), 2201 and 2202; 42 U. S.C. §§ 1983 and 1988.

2. A violation of the Fourteenth Amendment has occurred when public school authorities have made educational policy decisions which were based wholly or in part on considerations of the race of students and which contributed to increasing racial segregation in the public schools. Kelly v. Guinn, 456 F.2d 100, 105–108 [9th Cir. 1972], petition for cert. filed, 41 U.S.L. W. 3114 [U. S. Sept. 12, 1972] [No. 72–341]; Davis v. School District of City of Pontiac, Inc., 443 F.2d 573 [6th Cir. 1971], cert. denied, 404 U.S. 913, 92 S. Ct. 233, 30 L.Ed.2d 186 [1971]; Spangler v. Pasadena City Board of Education, 311 F.Supp. 501, 521 [C.D.Cal. 1970], and cases cited therein.

3. School authorities may not, consistent with the Fourteenth Amendment, maintain segregated schools or permit educational choices contributing to the development and growth of segregated schools because of community sentiment or the wishes of a majority of voters. Bradley v. Milliken, [6th Cir. Dec. 8, 1972 slip opinion], aff'g 345 F. Supp. 914 [E.D.Mich.1972], same 338 F.Supp. 582, 593 [1972]; United States v. School District 151 of Cook County, Ill., 432 F.2d 1147 [7th Cir. 1970] aff'g 301 F.Supp. 201, 230 [N.D.Ill.1969], cert. denied, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 [1971] and cases cited therein; Johnson v. San Francisco Unified School District, 339 F.Supp. 1315, 1341 [N.D.Cal.1971] and cases cited therein; Spangler v. Pasadena City Board of Education, supra, 311 F.Supp. at 523 and cases cited therein.

4. School authorities are accountable for the natural, probable and foreseeable consequences of their policies and practices, and where racially identifiable schools are the result of such policies, the school authorities bear the burden of showing that such policies are based on educationally required, non-racial considerations. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 25–26, 91 S.Ct. 1267, 28 L.Ed.2d 554 [1971]; Bradley v. Milliken, *supra*, 338 F.Supp. at 592 and cases cited therein; Kelly v. Guinn, *supra*, 456 F.2d at 105–107; United States v. School District 151 of Cook County, Ill., *supra*, 301 F.Supp. at 320.

5. The County and State Boards acted contrary to the Fourteenth Amendment by selecting school district boundaries for the central eastern portion of Allegheny County which conformed to and built upon patterns of residential segregation in this area of the county. Bradley v. Milliken, *supra*, slip opinion, at 9–10; Davis v. School District of Pontiac, *supra*, Sloan v. Tenth School District of Wilson County, Tenn., 433 F.2d 587, 589 [6th Cir. 1970]; United States v. Board of Education, Ind. School Dist. No. 1, Tulsa County, Okl., 429 F.2d 1253, 1259 [10th Cir. 1970]; Brewer v. School Board of City of Norfolk, Va., 397 F.2d 37, 42 [4th Cir. 1968]; Spangler v. Pasadena City Board of Education, *supra*, 311 F. Supp. at 522.

6. When the natural and foreseeable consequences of actions taken by school authorities are to preserve segregation within the public schools or to hamper its removal, such actions violate the Fourteenth Amendment. Bradley v. Milliken, *supra*; United States v. Texas Education Agency, 467 F.2d 848, 863–864 [5th Cir. 1972] and cases cited therein at n. 23; United States v. School District 151 of Cook County, Ill., *supra*, 404 F.2d 1125; Spangler v. Pasadena City Board of Education, *supra*.

7. The natural, foreseeable and actual effect of combining Braddock, North Braddock and Rankin into a single school district was to perpetuate, exacerbate and maximize segregation of school pupils. Such conduct constituted an act of *de jure* discrimination in violation of the Fourteenth Amendment. Bradley v. Milliken, *supra*, 345 F.Supp. at 939–940; Kelly v. Guinn, *supra*; Davis v. School District of City of Pontiac, Inc., *supra*, 443 F.2d 573 at 576; Sloan v. Tenth School District of Wilson County, Tenn., *supra*, 433 F.2d at 590; United States v. Board of Education, Ind. School Dist. No. 1, Tulsa County, Okl., *supra*, 429 F.2d at 1259 and cases cited therein; Johnson v. San Francisco Unified School District, *supra*, 339 F. Supp. 1341 and cases cited therein; Spangler v. Pasadena City Board of Education, *supra*, 311 F.Supp. at 522.

8. While the state may have no affirmative duty to eliminate public school segregation when it has done nothing to create it, nevertheless when it seeks change, it must proceed in a fashion that will lessen previously existing school segregation. Bradley v. Milliken, *supra*; United States v. Texas Education Agency, *supra*, 467 F.2d at 863–864; Davis v. School District of City of Pontiac, Inc. *supra*; Spangler v. Pasadena City Board of Education, *supra*, 311 F.Supp. at 522–523.

9. The State and County Boards' refusal to consider racial criteria in adopting the plan of organization of administrative units pursuant to Act 150 constituted an explicit racial classification in that educational matters related to racial criteria were treated differently from educational matters related to other criteria. Lee v. Nyquist, 402 U.S. 935, 91 S.Ct. 1618, 29 L.Ed.2d 105 [1971] aff'g 318 F.Supp. 710 [W.D.N.Y.1970] (three judge); Hunter v. Erickson, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 [1969]; Bradley v. Milliken, 433 F.2d 897, 902–904 [6th Cir. 1970] and cases cited therein. Racial classifi-

cations are constitutionally suspect and will be upheld only if absolutely necessary to the accomplishment of a permissible state policy. Hunter v. Erickson, *supra;* Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 [1967]; McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 [1964].

■ 10. A violation of the Fourteenth Amendment's prohibition against discrimination having been found, this Court has continuing jurisdiction of this action for all purposes, including the granting of effective relief. Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 [1955]; Bradley v. Milliken, *supra,* slip opinion at 53; 345 F.Supp. at 937; Kelley v. Altheimer Ark. Public School Dist. No. 22, 378 F.2d 483, 489 [8th Cir. 1967].

■ 11. On the basis of this Court's findings of unconstitutional school segregation, the present constitutional obligation of defendant school authorities is at the earliest possible time to adopt and implement an educationally sound, practicable plan of desegregation that promises realistically to achieve now and hereafter the greatest possible degree of actual school desegregation. Swann v. Charlotte-Mecklenburg School Board of Education, *supra;* Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 [1968]; Bradley v. Milliken, *supra,* 345 F.Supp. at 937 and cases cited therein.

■ 12. The remedial obligation rests with school authorities; but where in any way they fail, or are unable because of the circumstances of the case, to fulfill any part of the obligation promptly and fully, this court has broad equity power, and the duty to insure that demonstrable progress be made now; that a schedule for planning be adopted forthwith; and that necessary planning be specifically ordered and immediately undertaken in order that a constitutionally adequate plan may be

fashioned, and implemented as soon as possible. Swann v. Charlotte-Mecklenburg School Board of Education, *supra;* Carter v. West Feliciana School Bd., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 [1970], same 396 U.S. 226, 227–228, 90 S.Ct. 467, 24 L.Ed.2d 382 [1969]; Bradley v. Milliken, *supra,* 345 F.Supp. at 938; Acree v. County Bd. of Education of Richmond Co., Ga., 458 F.2d 486 [5th Cir. 1972]; Pennsylvania Ass'n Retard. Child. v. Commonwealth of Pa., 334 F. Supp. 1257, 1266–1267 [E.D.Pa.1971]; Fed.R.Civ.P. 52.

## ORDER

And now, this 15th day of May, 1973, this Court having found that the County and State Boards acted contrary to the Constitution in adopting the plan of organization of administrative units which combined Braddock, North Braddock and Rankin into a single school district, it is hereby ordered and directed that:

(1) Defendants Commonwealth of Pennsylvania, The Pennsylvania State Board of Education, and W. Deming Lewis shall prepare and submit to this Court within 45 days from the date of this Order a comprehensive plan of school desegregation for the central eastern area of Allegheny County to remedy the Constitutional violations found by this Court, which plan shall become final unless objected to by plaintiffs within 20 days after it is filed with the Court.

(2) Such plan shall meet the following standards:

(a) the plan shall alter the boundary lines of the General Braddock Area School District and, as appropriate, of adjacent and/or near-by school districts.

(b) the plan shall be an educationally sound and practical plan of desegregation that promises now and hereafter to achieve

the greatest possible degree of desegregation within the public schools of the central eastern area of Allegheny County, taking into account the practicalities of the situation.

(c) the plan shall set forth the dates on which it shall go into effect, which dates shall be set as early as possible.

(3) Defendants Allegheny Intermediate Unit Board of School Directors, and Edward Hallenberg, its President, shall assist in the preparation of the plan in all respects within their special area of responsibility and to the fullest extent render the benefits of their expertise and knowledge of local facilities and resources so that the terms of this order may be carried out by the other Defendants.

(4) In preparing said desegregation plan it is anticipated that defendants will consider the factor of racial balance along with other educationally relevant criteria and that the plan submitted by defendants will be consistent with the policies of the Department of Public Instruction and Human Relations of Pennsylvania relating to school integration.

(5) Defendants shall give each school district whose boundaries may be altered by said school desegregation plan the opportunity to be heard prior to the adoption of a final plan.

(6) Until said school desegregation plan is finally approved by this Court, defendants are hereby enjoined and restrained from taking any action, directly or indirectly, that may in any way limit or otherwise affect any school assignment options that could possibly be considered or proposed by any parties to this action.

(7) This Court expressly retains complete and continuing jurisdiction to modify this final judgment and decree on its own motion or on motion of any party.

(8) This judgment and decree shall take effect immediately.